[Nos. 41677, 41678.   En Banc.   December 9, 1971.]

THE STATE OF WASHINGTON, *Respondent,* v. WILLIAM E. BLUBAUGH, *Appellant.*

THE STATE OF WASHINGTON, *Appellant,* v. BEVERLY ANN RATHBUN, *Respondent.*

*Christopher T. Bayley, Prosecuting Attorney,* and *Byron H. Ward, Deputy,* for State of Washington.

*Webster, Kroum, McCann, Granberg, Bass & Mack, Gary F. Bass,* and *Larry L. Barokas,* for respondent Rathbun (appointed counsel for appeal).

SHARP, J.—These two cases were consolidated for hearing before this court. The sole issue involved in each of the

cases, concerns the burden of proof on one seeking discharge from confinement as a criminally insane person. Each of the defendants was institutionalized pursuant to jury determination that he committed the act charged, was insane at time of trial, and was an unsafe person to be at large. The issue is best understood in context of the two cases before us.

*State v. Blubaugh*: Defendant Blubaugh had a history of mental illness, having been civilly committed to Western State Hospital in 1965 after threatening two police officers with a knife while he held his young daughter. His mental illness was diagnosed at that time as schizophrenic reaction, paranoid type. He was discharged in December, 1966. In March of 1968, 1 week after defendant's wife had informed him that she had secured a default divorce, defendant went to the wife's home and, in the presence of two of his children, killed a man who was living with the wife by shooting him six times. Defendant was arrested and charged with first-degree murder. He pleaded a defense of insanity, and on June 10, 1968, a jury made special findings that the defendant did commit the crime charged but that he was insane at the time of the crime, and that he continued to be insane at the time of trial. Defendant was then confined as a criminally insane person who was unsafe to be at large. In April, 1970, defendant, pursuant to RCW 10.76.070, petitioned the superior court for release, and a jury trial was held. The jury was instructed that defendant must prove "beyond a reasonable doubt" the elements for his release: *i.e.*, (1) that he had become sane since his commitment, (2) that he was not liable to a recurrence or a relapse of mental unsoundness, and (3) that he was safe to be at large. Defendant contended that the burden of proof should be by a "preponderance of the evidence." The jury found defendant sane at that time but subject to recurrence or relapse, and not safe to be at large. Defendant appeals.

*State v. Rathbun*: Defendant Rathbun also had a history of mental illness, and beginning in 1956 had been hospitalized as a paranoid schizophrenic on four separate occasions.

In March, 1968, she killed a woman for whom she was working as a housekeeper, by beating and slashing her with a butcher knife. The apparent reason for the attack was that the woman had said something concerning defendant's children. Defendant was charged with second-degree murder and the trial court, sitting without a jury (defendant had waived a jury trial), found that she had committed the crime as charged, was insane at the time the crime was committed and at the time of trial, and that she was an unsafe person to be at large. Accordingly, she was confined as criminally insane. In January, 1970, defendant petitioned for release pursuant to RCW 10.76.070, and a jury trial was held in April, 1970. The jury was given instructions which stated that defendant had the burden of proving the elements for release by a preponderance of the evidence. In addition, the jury was given an instruction No. 5 which reads in part:

> [Y]ou are further instructed that, even where the preponderance of the evidence favors the petitioner, a reasonable doubt about the danger to the public or to the patient cannot be resolved so as to risk danger to the public or to the individual. A patient may have improved materially and appear to be a good prospect for restoration as a useful member of society; but, if an abnormal mental condition renders him potentially dangerous, reasonable doubts are to be resolved in favor of the public and in favor of the subject's safety.

The jury answered the special interrogatories relating to present and future sanity in the affirmative, and defendant was released. The state appeals.

The statutes controlling the treatment of the criminally insane are set forth in RCW 10.76. The procedure for release is found in RCW 10.76.070, which, in brief, provided for the following steps at the time these petitions for release were submitted:

(a) Application to the director of institutions for an examination of his or her mental condition and fitness to be at large;

(b) If the director of institutions certifies that there

is reasonable cause to believe that the person is sane and is safe to be at large, the director shall permit the committed person to petition the court that committed him for discharge;

(c) The petition is served on the prosecuting attorney and the prosecuting attorney is required to resist the application;

(d) The trial shall be to a jury and the trial shall proceed as in other cases, with the sole issue being whether the person has become a safe person to be at large since his commitment;

(e) The burden of proof is on the petitioner to prove that he is safe to be at large.

Washington has seen fit to distinguish between the mentally ill, who are provided for under RCW 71.02, and the criminally insane, provided for under RCW 10.76, as noted above. This distinction dates as far back as 1854, when the Territory of Washington adopted both Bal. Code § 2660, which provided for the examination and commitment of insane persons, and Bal. Code § 6959, which provided for commitment of individuals acquitted of a crime because of insanity and who were also "manifestly dangerous to the peace and safety of the community." Although these statutes have been amended from time to time over the years, most recently in 1967, the distinction has been maintained.

This distinction has been judicially approved in numerous decisions of this court. For example, in *Kenstrip v. Cranor*, 39 Wn.2d 403, 405, 235 P.2d 467 (1951), we stated:

> The doing of criminal acts makes an insane person criminally insane. The safety to society requires that the law distinguish the insane from the criminally insane in its disposition of them.

*See also, State ex rel. Thompson v. Snell*, 46 Wash. 327, 89 P. 931 (1907); *State v. Saffron*, 146 Wash. 202, 262 P. 970 (1927); *Brown v. Urquhart*, 139 F. 846 (C.C.W.D. Wash. 1905).

Thus, in Washington regardless of the procedure or burden of proof for the discharge of those civilly committed, a

different procedure and burden of proof can be prescribed for the discharge of those criminally insane. Unfortunately, the question presented here (i.e., what is the burden of proof on one seeking release) is not expressly answered by the discharge procedure statute, RCW 10.76.070, which merely provides that the cause shall be set down "for trial before a jury, and the trial shall proceed as in other cases."

The District of Columbia has had an abundance of litigation dealing with the criminally insane. In a habeas corpus proceeding brought by a defendant adjudged and institutionalized as criminally insane, the then Circuit Judge Warren E. Burger speaking for the court analyzed the burden of proof question as follows:

> The primary purpose of the statute—protection for the public and for the subject—suggests at once that the burden on the petitioner was intended by Congress to be heavy. . . .
> Would the standard of a preponderance of the evidence satisfy the purposes and objectives of Congress? We think not. A person so committed has made himself one of "an exceptional class." In a "close" case even where the preponderance of the evidence favors the petitioner, the doubt, if reasonable doubt exists about danger to the public or the patient, cannot be resolved so as to risk danger to the public or the individual. A patient may have improved materially and appear to be a good prospect for restoration as a useful member of society; but if an "abnormal mental condition" renders him potentially dangerous, reasonable medical doubts or reasonable judicial doubts are to be resolved in favor of the public and in favor of the subject's safety.

*Ragsdale v. Overholser*, 281 F.2d 943, 947 (D.C. Cir. 1960).

Later, in another habeas corpus proceeding, *Bolton v. Harris*, 395 F.2d 642 (D.C. Cir. 1968), the same court examined the District of Columbia commitment procedure provided for the criminally insane, concluding that automatic commitment without a judicial hearing for one successfully asserting the defense of insanity, violated the equal protection provision of the federal constitution. As an acquittal by reason of insanity does not constitute a finding of present insanity, automatic commitment is a denial of equal

protection because it treats criminal defendants differently from other mentally ill persons without reasonable justification. Although not necessary for the decision, the court reexamined the district's release procedure. It reasoned that since the criminally insane are entitled to a commitment hearing similar to that given the mentally ill, they should be governed by a similar release procedure. The court concluded that the burden of proof on one seeking release should be by a preponderance of the evidence, which is the district's burden of proof standard in habeas corpus proceedings challenging civil commitment.

However, our statutes governing commitment and release of the criminally insane are more explicit, and are clearly distinguishable from the Washington, D.C. statutes. Thus, in our state, whenever an insanity plea is entered and the jury finds the defendant not guilty by reason of insanity or mental irresponsibility, the jury also makes special findings concerning the defendant's present sanity, to wit, whether or not the defendant is liable to a relapse or a recurrence of the insanity, and whether or not he is safe to be at large. Once this determination is made and the defendant found unsafe to be at large, he can validly be treated as part of "an exceptional class of people" under the law and can be "treated . . . in a different fashion from persons who have somewhat similar mental conditions". *Overholser v. Leach*, 257 F.2d 667, 669-70 (D.C. Cir. 1958), *cert. denied*, 359 U.S. 1013, 3 L. Ed. 2d 1038, 79 S. Ct. 1152 (1959). Our statutes not only require an adversary, jury proceeding, but cast the burden of persuasion upon the defendant. Our statutes clearly manifest a legislative concern, which is not found in the district's statutory framework.

Other jurisdictions have faced this problem, reaching various results. In *State v. Shackford*, 262 A.2d 359, 366 (Me. 1970), the Maine Supreme Court concluded:

> The Legislature determined that when one enters into this exceptional class, the reasonable and humane thing to do is commit him to a mental hospital where he can undergo medical treatment which will, hopefully, enable him to return to society as a useful member, posing no

threat to his own safety or that of the general public. The public acquired a special interest in his confinement and release. That public interest must be protected by the Court. When consideration is being given to his enlargement, that public interest must be weighed against his claimed right to be set free.

The statute does not define the standard of proof. We think it reasonable to require that reasonable medical doubts and reasonable judicial doubts be resolved in favor of the public. Such was the conclusion reached by the United States Court of Appeals, District of Columbia Circuit, in Ragsdale v. Overholser, 108 U.S.App.D.C. 308, 281 F.2d 943 (1960).

We are aware Ragsdale was expressly overruled in the same Circuit in a later case. Bolton v. Harris, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968). (Burger, J. (now Chief Justice Burger) not sitting.)

The Oregon Supreme Court, while favoring a preponderance of the evidence rule, also injects an element of reasonable probability. Thus, in *Newton v. Brooks,* 246 Ore. 484, 492, 426 P.2d 446 (1967), the court summarized as follows:

> In summary, a person seeking release under ORS 136.730 must prove by a preponderance of the evidence (1) that he has the mental capacity to understand the difference between right and wrong, and (2) that with *reasonable probability* he will control his behavior so that his liberty will not be a danger to the public in the reasonably foreseeable future. He must prove both.

(Italics ours.) The Supreme Court of South Dakota discussed the question in *State ex rel. Barnes v. Behan,* 80 S.D. 370, 374, 124 N.W.2d 179 (1963), mentioning standards of reasonable doubt, reasonable certainty, and reasonable probability, stating:

> To obtain a release from the commitment, the patient must show freedom from such abnormal mental condition as would make him dangerous to himself or the community. After such an adjudication the burden of this showing rests on him. Even where the preponderance of the evidence favors the petitioner, the doubt, *if a reasonable doubt exists about danger to the public* or the individual, cannot be resolved so as to risk danger to the public or the individual. A patient may have improved

materially and appear to be a good prospect for restoration as a useful member of society, but, if an "abnormal mental condition" renders him potentially dangerous, reasonable medical doubts and reasonable judicial doubts are to be resolved in favor of the public and in favor of the patient's safety. Ragsdale v. Overholser, 108 U.S.App.D.C. 308, 281 F.2d 943. The evidence must be such as to make the court *reasonably certain* the patient has been restored to mental health before a discharge from custody should be granted. Orencia v. Overholser, supra [163 F.2d 763 (D.C. Cir. 1947)].

. . .

A person found not guilty by reason of insanity of a crime of violence and committed to a hospital for the insane should not be released as sane if there is a *reasonable probability* that by reason of mental disease or unsoundness of mind he is a danger to himself, to his own safety, or a menace to the safety, person or property of other people. Salinger v. Superintendent, 206 Md. 623, 112 A.2d 907; State ex rel. Wyman v. Turk, 62 Ohio App. 227, 23 N.E.2d 644 and see State ex rel. Thompson v. Snell, 46 Wash. 327, 89 P. 931, 9 L.R.A., N.S., 1191.

(Italics ours.)

Turning back to our statute, we find no clue in the language used, except the words "shall proceed as in other cases".[1] Inasmuch as this is a civil proceeding, we might conclude that the standard "preponderance of the evidence" would apply. However, analyzed in the context of the grave responsibility imposed upon the jury in such a proceeding, we doubt if the legislature intended that the jury merely weigh the evidence as in the ordinary civil proceeding, giving the nod to the party supplying the greater weight. On the other hand, proof beyond a reasonable doubt is the heaviest burden of proof imposed in our

[1]It is of some interest to note that, while the burden of proving his insanity at time of the criminal act is upon the defendant seeking acquittal by reason of insanity, the statutes are silent on the burden of proof to be applied by the jury in answering the special interrogatories relating to commitment. Nor is it the practice of the courts to instruct the juries in this regard. They are merely instructed that if they find the defendant not guilty by reason of insanity, they are to answer the interrogatories "yes" or "no".

Anglo-American system of jurisprudence and is peculiarly appropriate in the criminal law to protect the innocent individual from the power of the state.

In short, we find that neither of the "traditional" standards properly define the jury's role in this particular type of proceeding. We are asking the jury to prognosticate in a most difficult discipline, that of mental illness. We are not asking the jury to resolve or fix responsibility for past conduct—instead we are asking them to predict the future behavior of one who has been adjudged criminally insane and who has already committed a criminal act. For this reason, we suggest that the jury be instructed to deliberate simply in terms of probability of future criminal behavior, rather than in the traditional terms of reasonable doubt or preponderance of the evidence. Specifically, we suggest an instruction advising the jury that the burden of persuasion is upon the petitioner and that before a discharge from custody will be granted, they must find it highly probable that he is now sane, that he is not liable to a recurrence of the insanity, and is a safe person to be at large. In our opinion, further attempts to describe and define the petitioner's burden of proof, and the standards and measures to be applied, would only tend to confuse the jury, not clarify its responsibility.[2]

Defendant Blubaugh argues that the burden of proof imposed for his release came as a surprise to him and he was thus prejudiced. His argument is, apparently, that inasmuch as the burden of proof required for him to prove his defense of insanity was preponderance of the evidence, he was entitled to assume that the same measure would be imposed upon him for release. Thus, he succinctly states

---

[2]In an article in Washington Law Review, 41 Wash. L. Rev. 109 (1966) entitled Our Burden of Burdens, the author, Judge Lloyd L. Wiehl, points out that "An essential requirement for the determination of any judicial action is the existence of clear and comprehensible standards for describing and measuring the burden of proof." After discussing each of the present standards, he concludes that "Instructions phrased in terms of probability, being in degrees of belief, are clear, understandable and, above all, accurate."

that he learned to his surprise that it is "easier to get in than out." However, the point is not relevant to the problem before the court. Here, the defendant proved to the satisfaction of the jury by a preponderance of the evidence that even though he committed the act he was charged with, detention is an ordinary penal institution was inappropriate. But the jury's determination went further. By special interrogatories, the jury found that defendant's mental condition at time of trial was such that he was unsafe to be at large and should be treated as a patient rather than handled as a criminal.

On the other hand, the issue before the court confronted with his release petition, was whether or not the defendant, if released, would present a danger to himself or society. The petitioner's prior behavior, including the criminal act precipitating the state's concern (that is, the act of taking another's life), merely served to bring about a judicial determination that he should be treated in a medical setting rather than simply confined in a penitentiary. Having made this determination, society is now concerned solely with his future behavior and in striking a balance between the public safety and our concern for individual liberty, it is entirely appropriate that he not be released until the jury finds it highly probable that he is no longer a danger to himself or to others.

Applying this reasoning to the two cases before us, we conclude that the verdicts should not be disturbed. While we disapprove of the instructions defining the burden in terms of both reasonable doubt and preponderance of the evidence, which were given in the Rathbun case, we assume that the trial court was properly convinced that Mrs. Rathbun's release by the jury was proper under the circumstances and not the result of uncertainty as to the proper standard to be applied. Nor do we approve of instructing the jury in the customary criminal phraseology of "proof beyond a reasonable doubt", as was done in the Blubaugh case. We have, of course, no way of knowing whether the result would have been different if the burden

38

had been expressed in the simpler terms suggested here. Recognizing that defendant Blubaugh has received further care and has been under further observation since his release petition was denied, and further recognizing that there is no prohibition against successive certifications under RCW 10.76, we affirm the trial courts in both of the matters now before us.

HAMILTON, C.J., FINLEY, ROSELLINI, HUNTER, HALE, NEILL, STAFFORD, and WRIGHT, JJ., concur.