[Nos. 43244, 43245, 43246, En Banc. June 5, 1975.]
43247, 43248.

*In the Matter of the Application for a Writ of Habeas Corpus
of* LE ROY ALTER, *Petitioner,* v. CHARLES MORRIS, *as
Secretary of the Department of Social and
Health Services, Respondent.*

*In the Matter of the Application for a Writ of Habeas Corpus
of* WALTER A. WADZUK, *Petitioner,* v. CHARLES MORRIS,
*as Secretary of the Department of Social and
Health Services, Respondent.*

*In the Matter of the Application for a Writ of Habeas Corpus
of* DAVID LEE HICKEY, *Petitioner,* v. CHARLES MORRIS,
*as Secretary of the Department of Social and
Health Services, Respondent.*

*In the Matter of the Application for a Writ of Habeas Corpus
of* LILLIAN I. WILLIAMS, *Petitioner,* v. CHARLES MORRIS,
*as Secretary of the Department of Social and
Health Services, Respondent.*

*In the Matter of the Application for a Writ of Habeas Corpus
of* SHELDON R. STEELE, *Petitioner,* v. CHARLES MORRIS,
*as Secretary of the Department of Social and
Health Services, Respondent.*

Richard Emery, Richard Blumberg, and Allen Ressler of Legal Services, for petitioners.

Slade Gorton, Attorney General, and Stephen J. Hosch, Assistant, for respondent.

HAMILTON, J.—Five petitions for writs of habeas corpus have been consolidated since each presents substantially the same question.[1] Each petitioner is presently incarcerated in a Washington state mental hospital, committed as criminally insane after an acquittal of criminal charges by reason of insanity. They now challenge the criminal mental commitment law as violative of equal protection and due process.

---

[1] The individual facts of each petition are varied, as are the statutes in effect when each petitioner was originally acquitted and committed. The detailed facts are, however, not relevant to the determination of these petitions. The challenge is to the present statutory scheme.

Essentially petitioners argue that the present statutory scheme[2] applies a single standard (that of present dangerousness) to two indistinguishable groups—those acquitted of criminal charges on grounds of insanity, and everyone else subject to mental commitment. This single standard, they argue, is the subject of an unjustifiable difference in burden of proof and procedure: the insanity-acquitted individual carries the procedural burden, while in civil commitment proceedings the burden is entirely the State's.

The civil commitment statute, RCW 71.05, provides for progressively more lengthy detention of individuals based on a judicial determination of mental incapacity which must be progressively more severe for the longer detention period and which requires a progressively greater burden of proof from the State. In order to commit an individual for 14 days, the State must show by a preponderance of the evidence that the individual is a mentally ill person whose mental disorder presents a likelihood of serious harm to the individual himself or to others, or who is gravely disabled. RCW 71.05.240. In order to continue detention beyond the 14 days, the State must show by clear, cogent, and convincing evidence that:

> (1) Such person has threatened, attempted, or inflicted physical harm upon the person of another or himself after having been taken into custody for evaluation and treatment, and, as a result of mental disorder presents a likelihood of serious harm to others or himself; or
> (2) Such person was taken into custody as a result of conduct in which he attempted or inflicted physical harm upon the person of another or himself, and continues to present, as a result of mental disorder, a likelihood of serious harm to others or himself; or
> (3) Such person is in custody because he has committed acts constituting a felony, and as a result of a mental disorder, presents a substantial likelihood of repeating similar acts. In any proceeding pursuant to this subsec-

---

[2]The relevant statutes are RCW 10.77, as amended by Laws of 1974, 1st Ex. Sess., ch. 198, and RCW 71.05, as amended by Laws of 1974, 1st Ex. Sess., ch. 145.

tion it shall not be necessary to show intent, wilfulness, or state of mind as an element of the felony; or

(4) Such person is gravely disabled.

RCW 71.05.280, as amended by Laws of 1974, 1st Ex. Sess., ch. 145, § 19, p. 491.

 We equated clear, cogent, and convincing evidence to the criminal standard of beyond a reasonable doubt in *In re Levias*, 83 Wn.2d 253, 517 P.2d 588 (1973). Upon such a showing, a 90-day commitment order issues.

Commitment after the 90-day period requires the State to show by a new petition for treatment that the committed person:

(a) Has threatened, attempted, or inflicted physical harm upon the person of another during the current period of court ordered treatment and, as a result of mental disorder presents a likelihood of serious harm to others; or

(b) Was taken into custody as a result of conduct in which he attempted or inflicted serious physical harm upon the person of another, and continues to present, as a result of mental disorder, a likelihood of serious harm to others; or

(c) Is in custody pursuant to RCW 71.05.290(3) and as a result of mental disorder presents a substantial likelihood of repeating similar acts; or

(d) Continues to be gravely disabled.

RCW 71.05.320(2), as amended by Laws of 1974, 1st Ex. Sess., ch. 145, § 23, p. 494.[3]

A commitment period of 180 days is then authorized. No single commitment period can exceed 180 days. Successive commitments of 180 days are permissible on subsequent

---

[3]Subsection (c) of RCW 71.05.320(2), as amended, refers to RCW 71.05.290(3), which provides:

"(3) If a person has been determined to be incompetent (and the charges have been dismissed) [*sic*] without prejudice pursuant to RCW 10.77.090(3) (or its successors), then the professional person in charge of the treatment facility or his professional designee may directly file a petition for ninety day treatment under RCW 71.05.280(1). No petition for initial detention or fourteen day detention is required before such a petition may be filed."

showings of the same elements by the State in subsequent hearings.

It will be noted that the commission of acts constituting a felony is a ground for commitment for 90 days under RCW 71.05.280(3). However, that ground as such is only indirectly carried into the statute which authorizes commitment for 180 days. This would appear to be the result of a drafting error; RCW 71.05.320(2)(c) refers to RCW 71.05.290(3), which relates to persons incompetent to stand trial. Presumably, the section should instead refer to RCW 71.05.280(3), which relates to the commission of acts constituting a felony. Such an interpretation is consistent with the language of RCW 71.05.320(2)(c) ("substantial likelihood of repeating similar acts").

Individuals committed under the civil commitment statute may be released by the treating facility prior to expiration of the commitment period without court proceedings. RCW 71.05.260, .330, and .340.

A criminal defendant must plead and establish by a preponderance of the evidence the defense of insanity. RCW 10.77.030, as amended by Laws of 1974, 1st Ex. Sess., ch. 198, § 3, p. 786. The court or jury must make special findings stating whether the defendant committed the act charged, whether he or she is acquitted "because of insanity existing at the time of the act charged," whether he or she is "a substantial danger to other persons unless kept under further control by the court," whether he or she presents "a substantial likelihood of committing felonious acts jeopardizing public safety or security unless kept under further control," and whether it is "in the best interests of the defendant . . . that the defendant be placed in treatment that is less restrictive than detention in a state mental hospital." RCW 10.77.040, as amended by Laws of 1974, 1st Ex. Sess., ch. 198, § 4, pp. 786-87.

The burden of proof on the issue of commitment at the time of acquittal is unclear from the statute. The burden of proof on the issue of conditional release from commitment

is also unclear; under RCW 10.77.150, release is possible if the Secretary of the Department of Social and Health Services so recommends, and a reviewing court may deny release "only on the basis of substantial evidence." RCW 10.77.150, as amended by Laws of 1974, 1st Ex. Sess., ch. 198, § 13, pp. 793-94. The burden of proof at the time of final discharge is on the petitioner (the insanity-acquitted committed person); the standard of proof is a preponderance of evidence. RCW 10.77.200(2).

The foundation of petitioners' argument is that since both civil and criminal commitment groups are defined by their potential dangerousness, and the standard to be applied in determining the question of commitment in both cases is the likelihood of future dangerousness, the differences in commitment and release procedures deny equal protection and due process to the group which faces the heavier procedural burden—the insanity-acquitted group. Asserting the two groups to be indistinguishable and the standards to be the same, petitioners contend that equal protection requires that the difference in treatment be justified by its relation to a valid public purpose under a strict scrutiny test. The State, they argue, must show that a compelling interest is satisfied by subjecting the insanity acquitted to a more burdensome procedure than that confronted by the civilly committed. Apparently because the quantum of dangerousness might be one factor in such a compelling state interest, petitioners argue that the substantial defects in the "dangerousness" standard as a matter of statistics and predictability render it an improper diagnostic and legal determinant.

Petitioners' argument is cogent, and well presented. We are unable, however, to accept petitioners' approach. We disagree with the initial premise, and thus must reach a different conclusion. We think the two groups are distinguishable, and are therefore subject to different procedural burdens.

Both groups are in the commitment process primarily because of the State's interest in the safety and security of its citizens. Both statutes indeed attempt to determine dangerousness. Petitioners emphasize that under RCW 71.05.280, as amended in 1974, the civil commitment group includes individuals taken into custody because of "acts constituting a felony," which the State must show by clear, cogent, and convincing evidence. RCW 71.05.310. Those subject to criminal commitment have been found beyond a reasonable doubt to have committed an act which, except for their insanity, would have been a criminal act subjecting them to criminal penalties. Furthermore, the jury must find that there is a substantial likelihood that the accused will commit future acts jeopardizing the public safety. We are of the view that the legislature, in drafting these two statutes, contemplated that a prosecutor would proceed by way of criminal charges against persons who have committed serious felonies, reserving the civil process for persons who have committed less serious acts which may amount to felonies. The standard to be applied is one of dangerousness; clearly, past conduct is heavily indicative of the likelihood that a person will commit similar acts which will again endanger others. Therefore, it is logical that those who have reached the attention of the State because of serious antisocial acts, would be subject to more procedural burdens in obtaining their release than are those whose acts are less threatening to the public safety. This latter group is appropriately relieved of such burdens, the responsibility of proving their dangerousness falling accordingly to the State. The distinction in both cases is one of degree; the more serious acts result in a heavier burden on the actor on the issue of whether that person must be confined in the interest of public safety.

We are cognizant that the social and scientific determinants of dangerousness, especially future dangerousness, are far from perfect. However, the State's interest in the safety of its citizens is strong enough to allow the legisla-

ture some leeway in formulating what are essentially predictive standards. The theory of mental commitment underlying both statutes is twofold: preventive detention, and treatment. Neither statute authorizes commitment and detention on the sole ground of a person's need for treatment; protection of citizens is the primary justification for the deprivation of an individual's liberty under these statutes. Protection by prevention requires prediction; under our statutes, prediction is based in part on the fact of prior dangerous acts proved beyond a reasonable doubt. Full due process safeguards surround that proof. The fact that the prediction cannot be foolproof does not discredit the attempt. At this point in the development of our knowledge about human behavior, the dangerousness standard is not an unreasonable one.

Our conclusion that the classes are differently constituted is consistent with our decision in *State v. Blubaugh*, 80 Wn.2d 28, 491 P.2d 646 (1971), in which we considered differing discharge provisions governing civilly and criminally committed persons under statutes then in effect. We concluded that insanity-acquitted individuals who have been found unsafe to be at large could properly be treated as " 'an exceptional class of people.' " *State v. Blubaugh, supra* at 33. We held that equal protection was not violated by subjecting a person committed under the criminal insanity statute to a heavier burden in obtaining release from confinement. We think the *Blubaugh* reasoning is by analogy applicable here; different procedures are justified in determinations of present dangerousness, whether at the time of initial commitment or at the time of a petition for release from confinement.

The cases principally relied upon by petitioners do not compel another result. *Baxstrom v. Herold*, 383 U.S. 107, 15 L. Ed. 2d 620, 86 S. Ct. 760 (1966), involved a New York statutory provision allowing for summary commitment of a state prisoner at the end of his or her sentence, without the procedural safeguards of hearing and jury trial accorded

before civil commitment. The facts of *Baxstrom* distinguish it readily from the case at hand. As the court stated in *United States v. Brown*, 478 F.2d 606, 612 (D.C. Cir. 1973):

Insofar as *Baxstrom* pertains to procedures, its spirit may be applicable to all persons in prison. But insofar as it may govern burden and standard of proof, it is limited to persons at the end of the penal term.

(Footnote omitted.)

The provisions of the Washington statute comport with *Baxstrom*. Under RCW 10.77.020, as amended by Laws of 1974, 1st Ex. Sess., ch. 198, § 2, pp. 785-86, no person may be committed under the criminal commitment act for a period exceeding the maximum possible penal sentence for any offense charged for which that person was acquitted by reason of insanity. At the end of that period if the person is still in need of commitment or treatment, civil commitment proceedings must be instituted.

Petitioners also rely heavily on *Jackson v. Indiana*, 406 U.S. 715, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972). There the court was concerned with an involuntary indefinite commitment based solely on incompetency to stand trial on criminal charges. The mere filing of criminal charges was held insufficient to justify different treatment for purposes of indefinite commitment. The present petitions do not raise an issue of indefinite commitment prior to judicial determination as to commission of the acts charged. Our statutes do not permit such indefinite commitment based on incompetency to stand trial. RCW 10.77.090, as amended by Laws of 1974, 1st Ex. Sess., ch. 198, § 8, pp. 789-91.

Finally, petitioners rely heavily on *Bolton v. Harris*, 395 F.2d 642 (D.C. Cir. 1968), in which the District of Columbia Court of Appeals held that an insanity-acquitted individual could not automatically be committed but must be accorded procedures substantially similar to those in civil commitment proceedings. That court relied on *Baxstrom* for the proposition that "commission of criminal acts does not give rise to a presumption of dangerousness which, standing

alone, justifies substantial difference in commitment procedures and confinement conditions for the mentally ill." *Bolton v. Harris, supra* at 647. The court held that "persons found not guilty by reason of insanity must be given a judicial hearing with procedures substantially similar to those in civil commitment proceedings." *Bolton v. Harris, supra* at 651. The court acknowledged that the insanity acquitted could be treated differently from the civilly committed "to the extent that there are relevant differences between these two groups." *Bolton v. Harris, supra* at 651. The court upheld the statute requiring court review before release of the criminally committed when no such review was required for civilly committed. However, the court found that where habeas corpus was used as an alternative method of establishing eligibility for release, the burden of proof should be the same for civilly and criminally committed patients, stating: "While the criminal acts committed by a [criminally committed] patient may be evidence indicating whether or not the burden has been met, they do not justify a different burden." *Bolton v. Harris, supra* at 653.

We do not reach the same conclusion as did the *Bolton* court, and we note that a subsequent case from that court, *United States v. Brown, supra,* represents a substantial retreat from the *Bolton* holding. The court in *Brown* considered arguments similar to those advanced here, and found justification for a more lenient commitment standard for the insanity acquitted, stating:

> The difference between the classes for purposes of burden of proof, is in the extent of possibility and consequence of error. If there is error in a determination of mental illness that results in a civil commitment, a person may be deprived of liberty although he never posed any harm to society. If there is a similar error in confinement of an insanity-acquitted individual, there is not only the fact of harm already done, but the substantial prospect that the same error, ascribing the quality of mental disease to a less extreme deviance, resulted in a legal exculpation where there should have been legal responsibility for the antisocial action.

*United States v. Brown, supra* at 611.

We conclude then that the cases relied upon by petitioners are factually distinguishable from the present case, and are therefore not controlling. We adhere to our earlier decision in *Blubaugh*; and, based on our presumption of legislative intent, we consider the insanity-acquitted group to be " 'an exceptional class of people' " who have committed serious felonies and have raised the spectre of their own potential dangerousness by successfully advancing an insanity defense. This group is distinguishable from those committing less serious acts which nevertheless constitute a felony. We thus find permissible, if not artful, the statutory provisions relating to commitment and release of the insanity-acquitted individual.

Accordingly, the petitions are denied.

FINLEY, HUNTER, WRIGHT, and BRACHTENBACH, JJ., concur. STAFFORD, C.J., concurs in the result.

ROSELLINI, J. (dissenting in part)—As I understand the position of the petitioners in this case, they contend that, had they had the benefit of commitment and release procedures which are provided for persons civilly committed under RCW 71.05, it is probable that one or more of them would not have been confined or would have been released from confinement before this action was brought or would have a greater chance of early release in the future. The question before the court is: Did the legislature deny to the petitioners the equal protection of the laws when it provided more lenient procedures for commitment and more restrictive procedures for release of persons charged with crimes and found not guilty by reason of insanity but presently unsafe to be at large, than those provided in the case of other mentally ill persons (including those who have committed felonies but have not been charged and tried)?

RCW 10.77 places the burden of proving insanity at the time of the crime upon a defendant who alleges this defense. I do not understand the petitioners to challenge this

procedure. They are concerned with the further provision which requires the trier of the facts to make a finding whether a defendant's mental condition at the time of trial is such that he is not safe to be at large. RCW 10.77.040. They contend that the law places the burden on the defendant to show that he is safe to be at large, a burden not shared by persons civilly committed, and that as a consequence the criminal defendant is denied equal protection of the laws.

The relevant statutory provisions are, as to civil commitments: RCW 71.05.150-.200, .230-.250, requiring a showing of insanity and reasons for detention before and during the initial period of commitment; RCW 71.05.260, providing that the initial period of involuntary confinement shall be for no more than 14 days, unless the patient consents to a longer confinement; RCW 71.05.290, authorizing the person in charge of the treatment facility to petition the court for an order requiring a person involuntarily committed to undergo treatment for a period of 90 days in addition to the 14 days for which he was committed after a probable cause hearing (such a petition must show that the person committed falls within one of the classifications listed in RCW 71.05.280, which includes a class of persons who have committed acts constituting a felony and present a likelihood of repeating similar acts); RCW 71.05.320, providing that, if a petition filed under RCW 71.05.280 is granted, the patient must be released after 90 days unless the person in charge of the facility files a new petition for involuntary treatment on one of the grounds specified in the statute. Successive 180-day periods of confinement may be ordered by the court, after a hearing, upon application of the person in charge of the facility. RCW 71.05.320.

In all of these proceedings proof of the necessity of retaining the patient in confinement must be made by "clear, cogent, and convincing evidence" and the burden of proof rests upon the petitioner (the person in charge of the treatment facility). RCW 71.05.310. The person in charge of the

facility may release the patient at any time that, in his opinion, the patient no longer presents a likelihood of serious harm to others.

As to criminal commitments: RCW 10.77.120, providing that a person committed as criminally insane may not be discharged except upon the order of a court of competent jurisdiction; RCW 10.77.140, providing for periodic examination of the criminally insane patient every 6 months, and RCW 10.77.150, permitting him to petition the Secretary of Social and Health Services for conditional release.

The secretary is required to forward the petition to the court along with his recommendation concerning the application. The court is required to schedule a hearing on application where the secretary recommends conditional release, and may do so even though he does not recommend such a release.

This section of the statute provides:

> The court, after the hearing, shall rule on the secretary's recommendations, and if it disapproves of conditional release, may do so only on the basis of substantial evidence.

RCW 10.77.150(2). This sentence might at first glance appear to cast upon the secretary the burden of showing that the patient should not be released; however, if the sentence is read in context and with all of the provisions of the act in mind, it appears rather obvious that the legislature intended to require substantial evidence to support a disapproval of conditional release only in those cases where the secretary has recommended such release. Otherwise the provisions relating to conditional release would be inconsistent not only with the provisions placing the burden upon the patient to petition for conditional release but also with RCW 10.77.200, providing for final discharge upon the application of the criminally insane or conditionally released person. In the court hearing provided for in this section, there is placed squarely upon the petitioner (the criminally insane person) the burden of proving that there is no substantial danger that he will harm others if released.

In summary, the statutes providing for involuntary civil commitment authorize such commitment only for limited periods of time and require that the patient be released at the end of any such period unless the person in charge of the institution shows to the court that his treatment should be extended. The statutes providing for involuntary commitment of the "criminally insane," on the other hand, do not provide for automatic release but rather require a court hearing before the patient can be released. While there is provision for periodic review of his case, it is within the discretion of the custodian to recommend or refrain from recommending the release of such a patient, and if he does not recommend release, the burden is upon the patient to petition the court and show by a preponderance of the evidence that he is safe to be at large.

It is thus apparent that there are substantial differences between the way criminally insane persons are treated and the way other insane persons are treated under the act, both in the commitment and the release procedures. Defining the requirements of the equal protection clause of the federal constitution (to which Const. art. 1, § 12, our "Privileges and Immunities" clause, is identical in import), the United States Supreme Court has recently stated:

> [T]he Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways. *Barbier v. Connolly*, 113 U.S. 27 [28 L. Ed. 923, 5 S. Ct. 357] (1885); *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S. 61 [55 L. Ed. 369, 31 S. Ct. 337] (1911); *Railway Express Agency v. New York*, 336 U. S. 106 [93 L. Ed. 533, 69 S. Ct. 463] (1949); *McDonald v. Board of Election Commissioners*, 394 U. S. 802 [22 L. Ed. 2d 739, 89 S. Ct. 1404] (1969). The Equal Protection Clause of that amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated

alike." *Royster Guano Co. v. Virginia*, 253 U. S. 412, 415 [64 L. Ed. 989, 40 S. Ct. 560] (1920).

*Reed v. Reed*, 404 U.S. 71, 75-76, 30 L. Ed. 2d 225, 92 S. Ct. 251 (1971).

It is the position of the petitioners that the only difference between them and persons civilly committed who have done acts amounting to felonies is that in the one case the prosecutor has exercised his discretion to prosecute and in the other has refrained from doing so. This difference, they maintain, bears no relation to the purpose of the act, which is to provide treatment for the mentally ill and to afford society a reasonable degree of protection from the threat of harm to other persons which the insane may pose.

In their briefs, the petitioners have cited numerous cases in which courts have held that persons charged with or convicted of crimes are entitled to a hearing before being committed to mental institutions. I do not think it is necessary to consider all of those cases here, since it is not contended that the petitioners were denied a hearing before they were committed or that the statute does not afford them a hearing upon their application for release. It is not the denial of a hearing of which they complain but rather the necessity, thrust upon them by the statute, of shouldering the burden of proving their own fitness to be free, a burden not shared by persons civilly committed after committing acts of the same kind as those which caused the petitioners to be prosecuted and thus placed in the class of "criminally insane."

The petitioners maintain that if a mentally disturbed person's commission of a crime gives rise to a valid presumption that he continues thereafter to be a threat to his fellow man and, if committed, is not as likely as others to respond to treatment, and that he presents a greater risk of danger to others if released, that presumption applies equally to other "insane" persons who have committed crimes but have not been prosecuted. The legislature has not seen fit to place upon the latter class the burden of

showing that they are recovered and safe to be at large, and there is no reasonable ground for treating the petitioners differently. The mere fact that they were prosecuted, while the others were not, although they did the same kind of acts, bears no reasonable relation to their ability to respond to treatment or to the probability of future misconduct.

With regard to the commitment procedure, I do not find this argument persuasive. Insanity being a defense, and there being no suggestion that the constitution requires the State to prove the sanity of a person charged with a crime, the burden appropriately falls upon the accused to show that his mental condition at the time of the alleged offense was such that he was not legally responsible for his acts. If he succeeds in making such a showing to the satisfaction of the trier of the facts, it is reasonable that the State should be concerned that he not be set free immediately if that mental condition still persists and if it renders him a danger to the community. Since the jury has heard all of the evidence presented by the defendant, as well as any which the State may have offered on the subject, it is in as good a position as any judicial trier of the facts to determine whether the defendant's condition is such that he should be subjected to confinement and treatment. The statute does not purport to place the burden of proof upon the defendant, and the jury is not instructed that he has the burden of proof.

I think this procedure is fair and reasonable if the defendant is subject to the same release provisions as other patients in the state's institutions, and I believe the court should so hold. It is with respect to the procedures for release that I find the petitioner's arguments convincing. I can perceive no significant difference between the criminally insane and the civilly insane which affords a justification for placing the burden of proving recovery on the patient in the one case and on the institution in the other.[4]

---

'The petitioners' brief deals at some length with the question of the legitimacy of the standard of "dangerousness" as a criteria for commit-

The majority, however, says that there is a sigificant difference between the two classes which justifies a different treatment in the release as well as in the commitment procedures. First, they say that in a criminal proceeding the trier of the fact finds beyond a reasonable doubt that the defendant committed the act charged. But this is not always the case. Under RCW 10.77.080, the defendant may move for a judgment of acquittal on the grounds of insanity and may obtain such a judgment without the necessity of the State's proving that he committed the acts charged. *See State v. Jones*, 84 Wn.2d 823, 529 P.2d 1040 (1974) and *State v. Foster*, 84 Wn.2d 834, 529 P.2d 1046 (1974). Furthermore, it is not a valid distinction since, under RCW 71.05.310, the person in charge of a treatment facility must prove by "clear, cogent, and convincing evidence" that one of the conditions justifying the retention of the patient for additional treatment exists. One of these is that the patient has committed acts constituting a felony and presents a likelihood of repeating similar acts. The majority acknowledges that there is no difference between "proof beyond a reasonable doubt" and "clear, cogent, and convincing evidence." *In re Levias*, 83 Wn.2d 253, 517 P.2d 588 (1973).

But more importantly, even if there were a difference in the degree of proof of the criminal act required, that difference is not one which bears any logical or reasonable relation to the purpose of the statutes in providing for commitment or release. The question with which the statutes are concerned is whether the person to be committed is

ment or release, citing a number of experts who maintain that this concept has little relation to reality and that psychiatrists have been induced (by the necessity of testifying within the range of judicial concepts) to make predictions of probable future misconduct which are unwarranted under the standards of their own discipline. This material is worthy of the attention of all persons interested in the criminal law. However, it pertains more to the wisdom of the legislation than to its constitutionality, as far as the issues presented in this case are concerned. I have therefore refrained from lengthening this opinion with a discussion of the petitioners' attack upon the statutory criteria for commitment and discharge.

afflicted with a mental disorder which renders it necessary to confine him not only for the purpose of giving him treatment but also for the protection of society—not whether he has committed a crime. Undoubtedly the fact that he has committed a crime is evidence which is considered on this question; that evidence is, however, certainly not conclusive. The defendant in a criminal action may have been quite sane and the proof required by the State is the same.

Since the distinction based upon an alleged difference in degree of proof is not one which relates to the purpose of the statutes, it is not a significant one. Nevertheless, it was the distinction found by the court in *United States v. Brown*, 478 F.2d 606 (D.C. Cir. 1973), cited approvingly by the majority. Since it rests upon an invalid analysis, I do not find the holding of that case persuasive.

The view adopted by the court in the *Brown* case seems to me a vindictive one. The reasoning appears to be: The State proved the defendant did the criminal act, but he has escaped punishment by proving that he was insane at the time. It is only fair and just that he should receive some punishment—and confinement in a mental institution is appropriate punishment.

While this may be a view adopted by many courts—and it appears to be the one taken by the majority in this case —I do not think it accords with the spirit of the statutes dealing with confinement of the mentally ill. I find the statutes' general purposes to be ameliorative. They may deny equal protection in one particular aspect presented here; but as a whole they constitute humane and progressive legislation.

In a further attempt to find a relevant distinction between persons civilly committed and persons committed under criminal procedures, the majority adopts a theory that the legislature intended that only those persons who have committed "serious" felonies should be prosecuted, if they are insane, and that those who have committed "less serious" felonies should be committed under civil procedures.

I am not surprised to find that no statutory language is cited in support of this novel proposition. I am satisfied that none exists. Certainly the statutes under consideration here make no such distinction between felonies which are to be prosecuted and those which are to be excused in the hope that a civil commitment will be effected. It has always been my understanding that a felony is, by definition, a serious offense. If a crime is not serious, it is a misdemeanor.

The theory devised by the majority places a new burden upon the prosecutor. If the felony is not "serious," he must decide in advance of prosecution whether the accused is insane or else he must prosecute only "serious" felonies. The majority has not given him the benefit of any standard by which to determine which felonies are serious and which are trifling.

Even assuming that the majority has divined the true, though unexpressed, intent of the legislature, the distinction relied upon is still not sufficient. The civil statute expressly provides for the commitment of dangerous persons, and dangerousness is the criterion for the retention of a patient for prolonged treatment, whether his commitment was civil or criminal. Assuming that only serious or dangerous crimes are prosecuted, this does not mean that dangerous persons will be committed only under criminal procedures.

Nor does it mean that all persons who have been previously proven dangerous will be required to show their own recovery before they are set free. The question remains, Is there a legitimate purpose to be served in placing the burden of proof upon the institution in one case and upon the patient in the other? If there is such a purpose, the majority has not revealed it.

The decision of the United States Supreme Court in *Jackson v. Indiana,* 406 U.S. 715, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972), should be regarded as ample authority for the court to sustain the contention of the petitioners with regard to the unfairness of the release procedures, insofar as

they place upon the "criminal" patient the burden of proving that he has been cured. In that case, the petitioner, pleading not guilty to a charge of two robberies, was examined by court-appointed psychiatrists and found to be incompetent to stand trial. The court ordered him committed to the State Department of Mental Health until such time as that department should certify to the court that the "defendant is sane."

The psychiatrists had given their opinion that there was little hope that the petitioner's condition could be successfully treated in state institutions, and he argued to the court that his indefinite commitment amounted to a life sentence, and that without the charge against him the State would have been obliged to proceed under the civil statute, which involved different commitment standards and better treatment.

In upholding the petitioner's contention that he was denied equal protection of the laws, the court cited *Baxstrom v. Herold*, 383 U.S. 107, 111-12, 15 L. Ed. 2d 620, 86 S. Ct. 760 (1966), where it was held that a state prisoner civilly committed at the end of his prison sentence on the finding of a surrogate was denied equal protection when he was deprived of a jury trial which the State made generally available to all other persons civilly committed. Rejecting the State's argument that Baxstrom's conviction and sentence constituted adequate justification for the difference in procedures, the court said in that case that "there is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments."

The court in *Jackson v. Indiana, supra,* said at page 724:

If criminal conviction and imposition of sentence are insufficient to justify less procedural and substantive protection against indefinite commitment than that generally available to all others, the mere filing of criminal charges surely cannot suffice.

The court observed that the *Baxstrom* principle had been extended to cases involving commitment following an in-

sanity acquittal, citing *Bolton v. Harris*, 395 F.2d 642 (D.C. Cir. 1968); *Cameron v. Mullen*, 387 F.2d 193 (D.C. Cir. 1967) and *People v. Lally*, 19 N.Y.2d 27, 224 N.E.2d 87 (1966).[5]

The court said further, at pages 729-30:

> *Baxstrom* did not deal with the standard for release, but its rationale is applicable here. The harm to the individual is just as great if the State, without reasonable justification, can apply standards making his commitment a permanent one when standards generally applicable to all others afford him a substantial opportunity for early release.
>
> As we noted above, we cannot conclude that pending criminal charges provide a greater justification for different treatment than conviction and sentence. Consequently, we hold that by subjecting Jackson to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses, and by thus condemning him in effect to permanent institutionalization without the showing required for commitment or the opportunity for release afforded by § 22-1209 or § 22-1907, Indiana deprived petitioner of equal protection of the laws under the Fourteenth Amendment.

In *Baxstrom v. Herold, supra* at 111-12, the court had said:

> Classification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, but it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill *at all.* For purposes of granting judicial review before a jury of the question whether a person is mentally ill and in need of institutionalization, there is no conceivable basis for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments.

I think the clear import of these decisions of the United States Supreme Court is that, if distinctions are to be made between persons in prescribing procedures for commitment

---

[5]*And see State v. Clemons*, 110 Ariz. 79, 515 P.2d 324 (1973), a lucid opinion which is also supportive of my view here.

to, detention in, and release from state mental institutions, those distinctions must bear a logical relation to the purpose of the statute. I think it is also implicit in those cases, if any authority were needed for the proposition, that punishment is not a legitimate purpose of statutes dealing with the confinement and treatment of mentally ill or insane persons. Therefore the confinement of a person found not guilty of a crime by reason of insanity—beyond the time when he has recovered from his mental disorder sufficiently to be reasonably safe to be at large—is not to be sanctioned. To place upon a patient the burden of proving his own recovery, an almost insurmountable burden if his custodians do not choose to cooperate, is to accomplish this result in an indirect manner. In effect it permits the custodians to impose a prison sentence upon the criminally insane at their discretion.

In the case of *State v. Blubaugh*, 80 Wn.2d 28, 491 P.2d 646 (1971), relied upon by the majority, this court proceeded upon the assumption that only the criminally insane can be viewed as "manifestly dangerous to the community" and found a valid basis for legislative distinction between such persons and other insane persons in this supposed fact. Whether the civil statute then in effect made provision for the commitment of persons who had committed acts constituting a felony is not revealed in the opinion; but if it did, the opinion did not take account of that fact. In the case before us, no distinction can be made on the basis of "dangerousness" since the statute recognizes that persons civilly committed are apt to be dangerous, and there is no reason to suppose that a person who has been charged with a crime is more dangerous than one who has committed the same acts but has not been charged.

To the extent that it is inconsistent with the United States Supreme Court cases of *Jackson v. Indiana, supra,* and *Baxstrom v. Herold, supra, State v. Blubaugh, supra,* must be considered to have lost its legitimacy as authority upon the constitutional question presented here.

*Kenstrip v. Cranor*, 39 Wn.2d 403, 235 P.2d 467 (1951), was a case relied upon in *State v. Blubaugh, supra,* for the proposition that the safety of society requires that the law treat the criminally insane differently from other insane persons.

The petitioner in that case, who sought a writ of habeas corpus, had previously been adjudicated insane in a civil proceeding. After being confined in a state mental institution, he escaped and committed the crime of assault, to which he pleaded guilty and was sentenced. The petitioner alleged that he was still insane and sought to be transferred from the penitentiary to the Western State Hospital at Steilacoom. The court noted that the procedure and requirements for obtaining a release from the Western State Hospital were distinct from those of the penitentiary and/or the insane ward thereof and sanctioned this difference upon the notion, unacceptable under the present commitment statutes, that "[t]he safety of society requires that the law distinguish the insane from the criminally insane in its disposition of them." *Kenstrip v. Cranor, supra* at 405.

With regard to the petitioner's claim that he should not have been committed to the penitentiary as a criminal because he was insane at the time he committed the crime and at the time he pleaded guilty, the court cited the settled rule, that, while every person is presumed to be sane and competent, when he is once adjudicated to be insane a presumption arises in favor of his continuing incompetency, and if recovery is claimed to have occurred, the burden of proving it is upon the person making the allegation. It held that, because of the continuing presumption of insanity, the trial court was obliged to appoint an attorney as the petitioner's next friend and counsel, prior to arraignment, in order to make that step in procedure accord with due process of law. This, the court said, was because a plea of guilty is within the requirements of due process only when it is made with understanding. A new trial was ordered.

The court in that case expressly restricted its holding "to the rights of a person charged with a crime committed

after being adjudicated insane by a court of competent jurisdiction." *Kenstrip v. Cranor, supra* at 404.

What was said in *Kenstrip* concerning the presumption of continuing insanity has no application here. It will be seen that the court was not concerned with the provisions of a statute governing treatment and release of inmates in mental institutions, as the court is here. Rather, it was faced with the question of how due process can be accorded an accused who has been adjudicated insane and who has proposed to enter a plea of guilty, without the assistance of counsel or a next friend, where there has been no intervening adjudication that his sanity has been restored.

The presumption of a continuing state of insanity, after an adjudication, serves a useful purpose in certain situations, such as that confronting the court in *Kenstrip*. But here we deal with statutes which render the presumption irrelevant. RCW 71.05 manifests a legislative determination that the welfare of society and of committed persons is not served by a presumption of continuing insanity; that on the contrary the presumption must be that one confined in a state mental institution is receiving treatment and is improving. The burden is placed upon the institution to show, at frequent intervals, that the patient has not responded to the treatment sufficiently to be safe to be at large.

To my mind, this is the only logical place to rest this burden. The patient is under the control and supervision of the institution. He is at its mercy. Whether he receives treatment, and how effectual that treatment may be, is a matter within the control of his custodians. It is true that, under RCW 71.05.090, a person receiving treatment is given a reasonable choice of an available physician or other professional person qualified to provide such services; but as a practical matter, it is very unlikely that a person without independent means would have access to treatment by doctors who are not staff members. It is also true that a person challenging his detention has the right to an examination by a designated independent physician or mental health

professional, and the right to have the results of the examination used in the proceeding (RCW 71.05.470), but is the trier of the fact likely to give to the testimony of one who has made a single examination the same weight that he gives to the testimony of those who have had the person under their custody and surveillance during the entire period of his confinement? I think it unlikely.

It would seem apparent then that the legislature was responding to the developing awareness of the neglected and helpless state of the inmates of many if not most mental institutions when it saw fit to provide for frequent review of the status of patients in such institutions and to place the burden of proving the necessity of their continued confinement upon their custodians. It reasonably found that the common-law presumption of continuing insanity had no proper role to play in determining the treatment and the release procedures in the state's mental institutions.

Among the patients who receive the benefit of this new and remedial legislation are persons who have committed acts constituting felonies, and, as a result of mental disorder, present a likelihood of repeating similar acts. RCW 71.05.280.

It would seem, therefore, that when the legislature enacted Laws of 1974, 1st Ex. Sess., ch. 198 (RCW 10.77), providing many comparable changes in procedures dealing with the criminally insane, it would have given a person committed under these procedures the same benefit of the presumption of improvement under treatment. The only difference between persons who are committed under RCW 10.77.110 and those retained in confinement under RCW 71.05.280(3) (persons who have committed felonies and are likely to commit more) is that the "criminally insane" patient has been charged with a crime by the prosecutor and thus compelled to allege his own insanity, whereas the civilly committed patient has not been subjected to prosecution and his insanity has been determined upon the petition of another.

I would assume that where a person who has committed a felony is civilly committed, this is usually done at the instance of the prosecutor. In such cases, it would be safe to assume that the person's mental disorder is so obvious that the prosecutor sees no purpose to be served in subjecting him to the ordeal of prosecution. I would think it also safe to assume that where a charge has been filed against an alleged felon and he has successfully defended the charge on grounds of insanity, his mental disorder was not obvious to the prosecutor and had to be established by psychiatric proof offered by the defendant. It is not suggested that this difference—the degree of overt manifestations of insanity —affords a reasonable basis for presumptions that one group will respond to treatment where the other will not.

While it cannot be denied that the courts have often declared, as this court did in *Kenstrip v. Cranor*, 39 Wn.2d 403, 235 P.2d 467 (1951), that there is a difference between the "insane" and the "criminally insane" which justifies their being subjected to different treatment, I think that those statements have generally assumed that persons who were "criminally insane"—that is, persons who had been acquitted of a crime by reason of insanity—were dangerous in a way in which other mentally disordered persons were not. Whether, in the past, that assumption had a basis in fact or not, I think it is clear that under the present statutes it cannot be supported. A person who has committed a felony can be committed under either statute, provided all the conditions are met. Also persons who are "dangerous" for other reasons are committable under the civil statute. The criterion for release is one of "dangerousness" under each statute. There are no differences between the two groups which would justify the legislature in placing a more onerous burden on one group than the other in the process of obtaining release from the institution.

I would hold that the procedures for review and release prescribed in RCW 71.05 apply to persons committed under RCW 10.77.

Since they are persons who have committed "acts amounting to a felony," the petitioners are included within the express coverage of RCW 71.05. In each of their cases, the initial 14-day period of involuntary confinement, as well as additional 90- and 180-day periods have expired. I would not order the immediate release of the petitioners, however, since their custodians have not had an opportunity to show to the court that their continued confinement and treatment is necessary. Rather, I would refer the cases to the appropriate superior court with directions to hold a hearing in each case, at the conclusion of which the petitioner should be ordered released if the person in charge of the institution in which he is confined has not shown probable cause for his continued confinement according to the provisions of RCW 71.05.

UTTER, J., concurs with ROSELLINI, J.

Petition for rehearing denied September 16, 1975.