Joe BENHAM, Woodrow Biddle and Terry E. Anthony, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Joe EDWARDS and John R. Branning, individually and in their official capacities, Defendants.

Civ. A. No. C80–78R.

United States District Court,
N. D. Georgia,
Rome Division.

Nov. 14, 1980.

Robert B. Remar, Phyllis J. Holmen, Douglasville, Ga., Kay Giese, Dalton, Ga.; Howard Sokol, Milledgeville, Ga., Jonathan A. Zimring, John L. Cromartie, Jr., Atlanta, Ga., Georgia Legal Services, for plaintiffs.

Carol Atha Cosgrove, Senior Asst. Atty. Gen., Don A. Langham, First Asst. Atty.

**1054**

Gen., Michael J. Bowers, Senior Asst. Atty. Gen., Robert S. Stubbs, II, Executive Asst. Atty. Gen., Arthur K. Bolton, Atty. Gen., Atlanta, Ga., for defendants.

### ORDER

HAROLD L. MURPHY, District Judge.

### I

### INTRODUCTION

The named plaintiffs in this class action are presently confined in mental hospitals in the State of Georgia following their acquittal of criminal charges by reason of insanity. They challenge the procedures which led to their initial commitment and which govern their efforts to obtain release. Jurisdiction is founded on 28 U.S.C. § 1343(3) and 28 U.S.C. §§ 2201, and 2202. The class was certified on September 2, 1980 pursuant to Fed.R.Civ.P. 23(b)(2), as consisting of "all persons who are, or will be, confined in mental hospitals pursuant to Ga.Code § 27–1503 (Ga.Laws 1977, pp. 1293, 1295–96, Sec. 2) following findings of not guilty by reason of insanity." Defendant Joe Edwards is the chief executive officer and Commissioner of the Department of Human Resources. Defendant John Branning is the Superintendent of Northwest Georgia Regional Hospital in Rome, Georgia.

Presently pending is plaintiffs' motion for a preliminary injunction. A hearing was held on August 25 at which the plaintiffs presented one witness, a professor of psychiatry at Emory University, Dr. Lloyd T.

Baccus. The Court has examined the defendants' answers to plaintiffs' interrogatories, the deposition of Dr. Timothy Bullard, a clinical psychologist and director of forensic services at Northwest Regional Hospital, as well as the testimony of Dr. Baccus. The scholarly briefs submitted by counsel for both parties have proved invaluable to the Court in deciding the difficult questions presented in this case.

### II

### STATEMENT OF THE CASE

In order for the Court to grant preliminary injunctive relief, the plaintiffs must demonstrate (1) a substantial likelihood that they will prevail on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is denied; (3) that the injury to the plaintiffs outweighs any potential harm the injunction may cause the defendants; and (4) that granting the preliminary injunction will not disserve the public interest. *Camenisch v. University of Texas*, 616 F.2d 127, 130 (5th Cir. 1980); *Morgan v. Fletcher*, 518 F.2d 236, 239 (5th Cir. 1975).

The plaintiffs challenge the procedures for the commitment and release of persons found not guilty of criminal offenses by reason of insanity (hereinafter "insanity–acquitees") as violative of the due process and equal protection guarantees of the Fourteenth Amendment.[1] The proce-

---

**1.** Under the equal protection clause, the Court must determine the proper standard of review. *San Antonio Ind. School Dist. v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Persons found not guilty by reason of insanity certainly do not constitute a suspect class. But their involuntary hospitalization is a deprivation of a fundamental right–liberty, and thus should trigger the heightened level of review. *Cf. Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Although commentators have urged courts to invoke strict scrutiny, *e. g.*, Note, *Commitment Following Acquittal By Reason of Insanity and the Equal Protection of the Laws*, 116 U.Pa.L.Rev. 924, 933 (1968); German & Singer, *Punishing the*

*Not Guilty: Hospitalization of Persons Acquitted by Reason of Insanity*, 29 Rutgers L.Rev. 1011, 1012 n. 4 (1976); Kirschner, *Constitutional Standards for Release of the Civilly Committed and Not Guilty by Reason of Insanity: A Strict Scrutiny Analysis*, 20 Ariz.L.Rev. 233 (1978), the courts have been reluctant to articulate this standard. *See e. g., People v. McQuillan*, 392 Mich. 511, 221 N.W.2d 569, 579 n. 4 (1974); *State v. Krol*, 68 N.J. 236, 344 A.2d 289 (1975); *United States v. Jackson*, 553 F.2d 109, 120 (D.C.Cir.1976).

Because the Court finds that various provisions of Ga.Code § 27–1503 lack even a minimally rational basis, there is no need to resolve this issue here.

dures are set out in Ga.Code § 27–1503,[2] but must be read in conjunction with the interpretive gloss which appellate courts of Georgia have read into the statute. In particular, the following cases must be consulted to grasp the substance of § 27–1503: *Clark v. State*, 245 Ga. 629, 266 S.E.2d 466 (1980); *Skelton v. Slaton*, 243 Ga. 426, 254 S.E.2d 704 (1979); *Pennewell v. State*, 148 Ga.App. 611, 251 S.E.2d 832 (1979); *Pitts v. State*, 151 Ga.App. 691, 261 S.E.2d 435 (1979); *Dubose v. State*, 148 Ga.App. 9, 251 S.E.2d 15 (1978).

Following a finding of not guilty by reason of insanity,[3] the trial court retains jurisdiction over the insanity–acquitee and inquires into the present mental state of the person, and "upon a showing of good cause by the prosecutor"[4] may order such person to be confined to a mental hospital for not less than thirty days. In fact, the commitment is for an indefinite period of time since the State does not initiate a hearing to determine the current mental state of the insanity–acquitee.

To secure release, the erstwhile defendant, now patient, or the hospital, must petition the committing court. A petition cannot be entertained until the initial thirty day period has elapsed, and not within twelve months of any prior petition.

A valid petition will set in motion a hearing at which the sole issue is whether the

---

**2.** Ga.Code § 27–1503 provides in pertinent part:

(a) .... If such verdict of acquittal [by reason of insanity] is returned by the jury, the court shall retain jurisdiction over the person so acquitted and shall immediately inquire into the sanity of the person at the time of acquittal and, upon a showing of good cause by the prosecutor, may defer ruling upon the same and order such person to be confined in a State mental hospital, to be selected by the Department of Human Resources for a period of not less than 30 days. A person committed to the Department of Human Resources pursuant to this section shall not be released from confinement unless and until the court which committed him, after notice and hearing, shall find and determine that such person does not meet the criteria for civil commitment under Chapter 88–5 or 88–25, as now or hereafter amended. Nothing in this section contained shall prevent the transfer of such person from one State hospital to any other State hospital by the Department of Human Resources or the transfer of such patient to a hospital in another state in the manner provided by law, upon order of the superior court in the county from which he was committed, or in which he is detained.

(b) An application for the release of a person who has been committed to the Department of Human Resources under subsection (a), upon the ground he does not meet the civil commitment criteria under Chapter 88–5 or 88–25, as now or hereafter amended, may be made to the superior court of the county from which he was committed, either by such person or by the superintendent of the State hospital in which the said person is confined. No hearing upon such application · shall be allowed until the person committed shall have been confined for a period of not less than 30 days from the date of the order of commitment. If the finding of the court is adverse to releasing such person on the ground that such person meets the civil commitment criteria under Chapter 88–5 or 88–25, as now or hereafter amended, a further application shall not be heard by the court until one year has elapsed from the date of hearing upon his last preceding application.

**3.** Georgia recognizes the *M'Naghten* and the delusional compulsion standards as a complete defense to criminal culpability. Ga.Code § 26–702 provides:

A person shall not be found guilty of a crime, if at the time of the act, omission, or negligence constituting the crime, such person did not have mental capacity to distinguish between right and wrong in relation to such act, omission, or negligence.

Ga.Code § 26–703 provides:

A person shall not be found guilty of a crime when at the time of the act, omission, or negligence constituting the crime, such person, because of mental disease, injury, or congenital deficiency, acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing the crime.

*See generally*, P. Kurtz, Criminal Offenses in Georgia, 178 et seq. (1980) (hereinafter "Kurtz").

**4.** "Good cause" has been defined as "a reasonable cause to believe that the defendant presently meets the criteria for civil commitment." *Clark, supra*, 245 Ga. at 641, 266 S.E.2d 466. This showing by the prosecutor does not amount to a hearing on the issue, and appears to be more a matter of ritual than an effort to evaluate the individual. Only one of 106 currently confined individuals was afforded an evidentiary hearing prior to his indefinite commitment. Defendants' Answers to Plaintiffs' Interrogatories # 3(a).

insanity–acquitee meets the criteria for civil commitment[5] under the Georgia Mental Health Code, Ga. Code Ch. 88–5 or 88–25.[6]

A full panoply of rights are guaranteed the insanity–acquitee: (1) notice of his right to request a hearing; (2) right to counsel, and appointed counsel if the insanity–acquitee cannot afford to retain his own; (3) right to confront and cross–examine witnesses and to offer evidence; (4) right to subpoena witnesses and to require testimony to be given in person or by deposition from any physician upon whose evaluation the decision may rest; (5) right to have established an individualized plan specifically tailored to the person's treatment needs; (6) right to be examined by a physician of his own choosing (at his own expense); and (7) right to have representatives or guardians ad litem appointed in his behalf. *Clark, supra*, 245 Ga. at 642–43, 266 S.E.2d 466. These rights are also provided to M.H.C. committees.[7] Ga. Code § 88–506.-2; § 88–501(u); § 88–501(w); § 88–502.18.[8]

The release hearing for insanity–acquitees differs from the commitment and release hearings for M.H.C. committees in a number of ways: (1) insanity–acquitees are presumed to be mentally ill;[9] (2) the burden of proof is cast upon the insanity–acquitee seeking release; (3) the state is not required to prove by clear and convincing evidence that the insanity–acquitee meets the Chapter 88–5 criteria for continued commitment; (4) once an application has been denied, another cannot be filed within one year; (5) the release of an insanity–acquitee must be ordered by the committing court. Ga. Code § 27–1503(b); *Clark, supra; Pennewell, supra; Pitts, supra.* M.H.C. committees are not encumbered with any of these burdens. The State must prove by clear and convincing evidence and without the aid of a presumption that the M.H.C. committee is mentally ill and in need of treatment. The State must "recommit" the individual within six months of the initial commitment, and at twelve month intervals thereafter. The hospital may release the patient at any time without any judicial approval. Ga. Code §§ 88–501(u); 88–506.2; 88–506.5; 88–506.6.

---

5. To classify insanity–acquitees as "criminal committees" and persons committed pursuant to the Georgia Mental Health Code, as "civil committees" is to some extent misleading. *See generally*, German and Singer, *Punishing The Not Guilty: Hospitalization of Persons Acquitted by Reason of Insanity*, 29 Rutgers L.Rev. 1011, 1012–13 n. 5 (1976) (hereinafter "Punishing The Not Guilty"). Since the thrust of plaintiffs' argument challenges the different treatment afforded insanity–acquitees and persons committed pursuant to the Mental Health Code, affixing these labels may obscure the similarities of their circumstances and legal status. Certainly, the labels have no constitutional significance. *State v. Krol*, 68 N.J. 236, 344 A.2d 289, 297 (1975). Persons committed pursuant to the Mental Health Code will hereinafter be referred to as "M.H.C. committees" to contrast them from insanity–acquitee committees.

6. Ga. Code Chapter 88–5 pertains to the hospitalization and treatment procedures for the mentally ill. Ga. Code Chapter 88–25 pertains to the mentally retarded. An individual is subject to involuntary commitment under Chapter 88–5 if he is mentally ill and (1) presents a substantial risk of imminent harm to himself or others as manifested by either recent overt acts or recent expressed threats of violence which present a probability of physical injury to himself or other persons, or (2) is so unable to care for his own physical health and safety as to create an imminently life–endangering crisis. Ga. Code § 88–501(v).

The criteria for the involuntary commitment of the mentally retarded are scattered throughout numerous provisions of the Ga. Code. *See*, Ga. Code §§ 88–2502(d); 99–3303(c); and 88–2504(f).

7. In addition, M.H.C. committees are entitled to a hearing–indeed a hearing is mandatory if not waived in writing–within seventeen days of their initial commitment. Ga. Code § 88–506.-2(a) and (c).

8. These procedures apply to the mentally ill. The mentally retarded are granted similar rights in Ga. Code Chapter 88–25. In the interest of simplicity, the Court will refer solely to the mentally ill and not the mentally retarded provisions throughout this opinion.

There is only one insanity–acquitee who is currently in a hospital for the mentally retarded. Defendants' Answers to Plaintiffs' First Interrogatories # 8b. There are approximately 105 insanity–acquitees in hospitals for the mentally ill. *Id.* # 8a.

9. *See*, Ga. Code § 38–118.

Although the Court must resolve a number of subsidiary questions, nine fundamental issues are posed by this litigation.

(1) Is the State constitutionally required to initiate a hearing prior to commitment of the insanity–acquitee?[10]

(2) At this commitment hearing, does the constitution require the State to bear the burden of proof, and if so, what is the standard of proof?

(3) Is it constitutional to invoke a presumption of insanity at this hearing?

(4) May the admissibility or weight of evidence be different at an M.H.C. hearing than at an insanity–acquitee hearing?

(5) May the State adopt different release procedures for the two classes of patients?

(6) Does the constitution permit the one–per–year limitation on release petitions?

(7) Does the Constitution require the State to bear the burden of proof at release hearings?

(8) Is it constitutional to prohibit the hospital from transferring the insanity–acquitee to another facility without judicial approval?

(9) If there are constitutional infirmities, what relief, if any, is proper with respect to currently confined insanity–acquitees?

## III

## LIKELIHOOD OF SUCCESS ON THE MERITS

### A

### STATE INITIATED COMMITMENT HEARING

On the 20th day of January 1843, Daniel M'Naghten shot Edward Drummond in the back. Mr. Drummond languished until the 25th of April and then died. *Daniel M'Naghten's Case*, 10 Cl. & F. 200, 8 Eng. Rep. 720 (H.L. 1843). M'Naghten was tried and acquitted by reason of insanity. He languished in a mental hospital for twenty–

two years, without the benefit of any further proceedings, until he died in 1865. No court ever determined whether he was presently mentally ill.

As of 1968, only three states statutorily required a civil commitment hearing prior to the confinement of an insanity–acquitee. Note, *Commitment Following Acquittal By Reason of Insanity and the Equal Protection of the Laws*, 116 U.Pa.L.Rev. 924 n. 1 (1968) (hereinafter "Commitment Following Acquittal") (Ariz.R.Crim.P. 288 (1956); La. Rev.Stat.Ann. § 28:59 (1951) (misdemeanors only); Wyo.Stat.Ann. § 7–241(b) (Supp. 1965)). In 1968, the Court of Appeals for the District of Columbia decided *Bolton v. Harris*, 395 F.2d 642 (D.C.Cir.1968). Chief Judge Bazelon found the D.C. statute by which all acquitees were automatically committed for an indefinite period of time unconstitutional on equal protection grounds: "[P]ersons found not guilty by reason of insanity must be given a judicial hearing with procedures substantially similar to those in civil commitment proceedings." *Id.* at 651.

The Georgia insanity–acquitee statute specifically provides that the *criteria* for the commitment of M.H.C. committees apply to the commitment of insanity–acquitees. The *procedures* utilized to commit an M.H.C. patient are not specifically made applicable to insanity–acquitees. M.H.C. committees can be committed only after a hearing has been held to determine whether the person meets the commitment standards, unless the M.H.C. committee waives his right to a hearing in writing. Ga. Code § 88–506.2. In *Clark v. State*, 245 Ga. 629, 266 S.E.2d 466 (1980) the Supreme Court of Georgia decided that the mere *availability* of a hearing after initial commitment satisfies the constitutional requirements of due process and equal protection. *Clark* held that the insanity–acquitee's failure to apply for a hearing constituted a waiver of his constitutional rights.[11]

10. The plaintiffs do not challenge the thirty day prehearing commitment. They argue that the State must conduct a hearing when that observation period ends.

11. The plaintiff in *Clark* had the benefit of a hearing; the Superior Court judge denied his application for release. Arguably, then, this aspect of the *Clark* decision was dictum since

The equal protection component of the *Bolton* Court's analysis was derived principally from the Supreme Court's decision in *Baxstrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966) where a New York statute which provided for the commitment of prisoners to mental hospitals was held unconstitutional. In New York, a convicted prisoner could be transferred to a mental hospital with few of the procedural safeguards which were afforded other committees. The Court acknowledged that there were differences between prisoners and non–prisoners, and that the former's prior criminal conduct was evidence of dangerousness. But the fact that a prisoner had engaged in criminal conduct in the past did not justify diluted procedures for his present commitment:

> Classification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, but it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill *at all.* . . .

*Id.* at 111, 86 S.Ct. at 762.

The *Bolton* Court's extension of the *Baxstrom* principle to insanity–acquitees was cited approvingly in the subsequent Supreme Court case of *Jackson v. Indiana*, 406 U.S. 715, 724, 92 S.Ct. 1845, 1851, 32 L.Ed.2d 435 (1972), where the Indiana scheme of committing persons found incompetent to stand trial for an indefinite period of time without a civil commitment hearing was found unconstitutional on equal protection and due process grounds.

■ The fact that insanity–acquitees have been through a trial which determined that they committed an antisocial act, but were not culpable because of their mental state at the time the act was committed, does not obviate the need for a mandatory, state–initiated pre–commitment hearing.

First, the lodestar of the M'Naghten defense is that the defendant was not accountable "at a particular moment for a particular act." G. Fletcher, Rethinking Criminal Law, § 10.4, p. 838 (1978); A. Goldstein, The Insanity Defense, 45–67 (1967). The acquitee's mental state *at the time of trial* is not an issue at the trial.[12]

■ Second, M.H.C. commitment relies on factors which are foreign to the *M'Naghten* defense. *Cf. Powell v. Florida*, 579 F.2d 324, 330 (5th Cir. 1978). The M.H.C. criteria are (1) mental illness and (2) substantial risk of imminent harm as manifested by recent overt acts or threats, or inability to care for oneself creating an imminently life–endangering crisis. Ga. Code § 88–501(v). The *M'Naghten* test requires only the absence of mental capacity to distinguish between right and wrong in relation to the otherwise criminal act–an act which is not necessarily a manifestation of the likelihood of imminent harm. Ga. Code § 26–702.

Numerous courts have endeavored to rationalize the automatic pre–hearing commitment of insanity–acquitees despite the substantive difference between the insanity defense and the criteria for the commitment of non–insanity–acquitees. In *Chase v. Kearns*, 278 A.2d 132 (Me.1971), for example, the Court explained the absence of a hearing prior to commitment as a function of the presumption which operated to the detriment of the insanity–acquitee to the effect that a mental state once proved is presumed to persist. Additionally, the pre–hearing commitment was held to reflect a wise legislative policy which required the insanity–acquitee to be evaluated by the hospital staff prior to his release petition, in the interest of public safety. These rationales also convinced the California Supreme Court in *In re Franklin*, 7 Cal.3d 126, 101 Cal.Rptr. 553, 496 P.2d 465 (1972) and *In re Slayback*, 209 Cal. 480, 288 P. 769 (1930), to uphold the constitutionality of its prehear-

---

the issue was moot. 245 Ga. at 641, 266 S.E.2d 466.

**12.** Of course, the defendant's competence to stand trial must be determined. Ga. Code

§ 27–1502. The standard of competency bears little relationship to the criteria for M.H.C. commitment or the *M'Naghten* defense. *See generally*, Kurtz, at 183–84.

ing commitment statute. The Missouri Supreme Court in *State v. Kee*, 510 S.W.2d 477 (Mo.1974), and the Wisconsin Supreme Court in *State ex rel. Schopf v. Schubert*, 45 Wis.2d 644, 173 N.W.2d 673 (1970), similarly were persuaded that no hearing need precede the commitment of an insanity–acquitee.

■ The reasoning of these decisions is contaminated with a basic flaw. The presumption of continued insanity is a ubiquitous concept which serves to justify many of the procedures which are the subject of this litigation. Whatever the presumption's validity may be in other contexts, it provides not even a kernel of justification for depriving the insanity–acquitee of his right to a pre–commitment hearing. In short, that which is presumed is insufficient to justify commitment *at all*, to say nothing of commitment without a hearing. What is presumed is the continuity of the mental state earlier established–the mental incapacity to distinguish between right and wrong. In Georgia, this simple finding does not suffice to meet the criteria for M.H.C. commitment.

The second rationale–that the state has an interest in committing the individual to enable psychiatrists to evaluate his current mental state proves too little and too much. Too little because the psychiatrists are given an opportunity to evaluate the insanity–acquitee during the thirty–day preliminary period. The plaintiffs have explicitly refrained from challenging the constitutionality of the observation period. When this period elapses, however, the justification vanishes–there is no longer any reason why the State should not initiate a hearing as it does with M.H.C. committees. The argument proves too much because in Wisconsin, when *Schopf* was decided, in Missouri, when *Kee* was decided, and in Maine, when *Chase* was decided, the insanity–acquitee could apply for his release *the day he was committed.* There was no mandatory hiatus during which the insanity–acquitee was barred from applying for his release. *Schopf, supra*, 173 N.W.2d at 678; *Kee, supra*, at 483; *Chase, supra*, at 138. *Cf. In re Lewis*, 403 A.2d 1115, 1119 (Del.Super.1979).

■ The 30 day observation period is constitutionally permissible, and is sufficient to safeguard the public safety while the hospital staff conducts the necessary evaluation:

> It is hardly asking too much to require that a defendant who is absolved from punishment by society because of his mental condition at the time of the criminal act should accept some restraint on his liberty by confinement in a hospital for such period as is required to determine whether he has recovered and whether he will be dangerous if released.

*Ragsdale v. Overholser*, 281 F.2d 943, 949 (D.C.Cir. 1960).

■ On equal protection grounds, then, there is no rational explanation why insanity–acquitees should not be guaranteed a state–initiated hearing to determine their present mental state. *People v. McQuillan*, 392 Mich. 511, 221 N.W.2d 569 (1974); *People v. McNelly*, 371 N.Y.S.2d 538 (Sup.Ct. 1975); *State v. Krol*, 68 N.J. 236, 344 A.2d 289 (1975); *State v. Wilcox*, 92 Wash.2d 610, 600 P.2d 561 (1979); *State v. Alto*, 589 P.2d 402 (Alaska 1979); *State v. Clemons*, 110 Ariz. 79, 515 P.2d 324 (1973); *Cf. Cameron v. Mullen*, 387 F.2d 193, 201 (D.C.Cir.1967). Two states have held that even the preliminary observation period violates the equal protection clause. *Wilson v. State*, 259 Ind. 375, 287 N.E.2d 875, 881 (1972) ("If the State is concerned about the potential danger to the defendant or the community in the event of an acquittal upon the criminal charge, the procedure for civil commitment should be commenced . . . in advance of the verdict."); *State ex rel. Kovach v. Schubert*, 64 Wis.2d 612, 219 N.W.2d 341 (1974) (overruling *Schopf, supra*). This Court holds only that equal protection requires a hearing when the 30 day observation period ends.

■ Due process requires no less. In *State v. Krol*, 68 N.J. 236, 344 A.2d 289 (1975) the Court recognized that the State's reliance on the generalization that insanity–acquitees are dangerous and thus not entitled to a state–initiated hearing violated due process:

[The State's argument] does not rationally establish that any particular individual in the class should be confined even if he is not dangerous. . . . The decisive consideration where personal liberty is involved is that each individual's fate must be adjudged on the facts of his own case, not on the general characteristics of a 'class' to which he may be assigned.

*Id.* at 299.

In *Bolton*, Chief Judge Bazelon found a similar due process violation in the D.C. automatic commitment statute. The foundation for the holding was *Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967) where the Supreme Court held that a defendant convicted under Colorado law for "indecent liberties" could not be given an indeterminate sentence under the Colorado Sex Offenders Act without a full hearing. The fact that the defendant's criminal trial was replete ·with due process protections was beside the point since commitment under the Sex Offender's Act required distinct findings of fact. Similarly, the commitment of an insanity–acquitee requires distinct findings. *Powell, supra,* at 330; *Bolton, supra,* at 650.[13] *Specht* emphasized that invoking the Sex Offender's Act "means the making of a new charge leading to criminal punishment." *Specht, supra,* 386 U.S. at 610, 87 S.Ct. at 1212. While the commitment of an insanity–acquitee is not a "criminal punishment," the label is of no constitutional significance. *Cf., In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). The confinement of an individual in a psychiatric hospital involves a "massive curtailment of liberty." *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394

(1971); *Vitek v. Jones,* 445 U.S. 480, 491, 100 S.Ct. 1255, 1262, 63 L.Ed.2d 552 (1980); *Addington v. Texas,* 441 U.S. 418, 425–26, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979). The fact that the commitment, in part, is for rehabilitative purposes does not vitiate this Court's scrutiny:

Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. . . . The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well–meaning but without understanding.

*Olmstead v. United States,* 277 U.S. 438, 479, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J. dissenting).

In *Fasulo v. Arafeh,* 173 Conn. 473, 378 A.2d 553 (1977), the Connecticut Supreme Court invalidated the Connecticut procedure for the release of non–insanity–acquitees. The Court's analysis applies in this situation as well:

[T]o require a patient to initiate judicial review of his confinement . . . ignores the practical considerations. . . . Briefly, these include the difficulties of overcoming an isolated environment to initiate and coordinate a challenge to one's confinement. For instance we cannot assume that friends and allies will always be available to secure counsel and marshal evidence on the patient's behalf. . . . [T]hough the Statute provides for annual notice to patients of their right to a hearing, the burden of requesting and, therefore, initiating review remains with the patient. The state seeks to justify this procedure by arguing that allowing the patient to choose whether to have a hear-

---

**13.** In *Clark v. State, supra,* 245 Ga. at 645, 266 S.E.2d 466, the Court attempted to distinguish *Bolton* on the basis that in D.C., the prosecutor must prove beyond a reasonable doubt that the defendant was sane, whereas in Georgia the defendant must prove by a preponderance of the evidence that he was insane in order to avail himself of the defense. *See also, State v. Kee, supra; Punishing The Not Guilty,* at 1027. But this purported distinction obscures the focus of the *Bolton* decision which was that insanity–acquitees must be granted a hearing to determine *present mental condition,* in spite of

the degree of certainty as to his past insanity. Note, *Criminal Procedure–Automatic Commitment of Defendants Found Not Guilty By Reason of Insanity,* 41 Mo.L.Rev. 439, 443 (1976). It would make no difference if the defendant's insanity at the time of the act was established to a mathematical certainty.

Following the commitment which gave rise to the *Bolton* decision, the D.C. Code was amended: The defendant must now prove his insanity by a preponderance of the evidence. D.C. Code § 24–301(j).

ing will avoid unnecessary judicial proceedings. We doubt whether this rationale is adequate since it ignores the practical difficulties of requiring a mental patient to overcome the effects of his confinement, his closed environment, his possible incompetence and the debilitating effects of drugs or other treatment on his ability to make a decision which may amount to the waiver of his constitutional right to a review of his status.

*Id.* at 557.

■ The defendants argue that the "elective" nature of the commitment hearing is reasonable. The failure of an insanity–acquitee to apply for release constitutes a waiver which is not offensive to the Constitution, they contend. *Cf. Clark v. State, supra,* 245 Ga. at 641, 266 S.E.2d 466. This argument fails to address the equal protection implications. Regardless of how reasonable this scheme may be, it is not the procedure which applies to M.H.C. committees. There is no relevant difference between M.H.C. committees and insanity-acquitees offered by the defendants to explain the difference in procedure. Any difference in the treatment of these two groups must be anchored in a relevant difference in the persons affected.

■ Furthermore, it violates due process to infer a waiver from the patient's inaction. As indicated by the *Fasulo* decision, the patient's circumstances are not conducive to the assertion of his rights. As one commentator observes:

Although many states permit courts to presume waivers of various commitment rights by a person's failure to affirmatively seek their protections, given that the individual has been alleged to be mentally ill, these presumptions seem insufficient to assure the valid waiver of a constitutional right. *Cf. Miranda v. Arizona,* 384 U.S. 436, [86 S.Ct. 1602, 16

L.Ed.2d 694] (1966); *Heryford v. Parker,* 396 F.2d 393 (10th Cir. 1968). Like waiver of rights in criminal cases or emergency preliminary hearings, waiver of rights in full commitment hearings should be accomplished affirmatively, on the open record, and should be voluntary and knowing. In order to assure that valid waivers occur, the right to counsel should *not* be waivable, and the waiver of other important rights should be carefully scrutinized by the court, perhaps in a manner similar to the acceptance of guilty pleas in criminal cases.

Legal Rights of Mentally Disabled Persons, Practicing Law Institute, Vol. I, p. 265 (1979); *Cf. Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *Fasulo v. Arafeh,* 173 Conn. 473, 378 A.2d 553, 557 (Conn.1977); Fed.R.Crim.P. 11.

In *Vitek v. Jones,* 445 U.S. 480, 493–94, 100 S.Ct. 1254, 1264, 63 L.Ed.2d 552 (1980) the Court held:

A criminal conviction and sentence of imprisonment extinguish an individual's right to freedom from confinement for the term of his sentence, but they do not authorize the State to classify him as mentally ill and to subject him to involuntary psychiatric treatment without affording him additional due process protections.

The Court held the prisoner must be afforded, at a minimum, an adversary hearing to determine his mental state at the time of the proposed commitment.[14] If a prisoner is entitled to this protection, it follows ineluctably that a person acquitted of criminal charges is entitled to no less. *Powell v. Florida,* 579 F.2d 324, 330 (5th Cir. 1978).

■ Like the hapless Daniel M'Naghten, insanity–acquitees may remain in mental hospitals for many years after their acquit-

---

**14.** Litigation is pending in the United States District Court for the Middle District of Georgia concerning the possible deficiencies in the Georgia procedure for the commitment of prisoners. *Freeman et al. v. Georgia Dept. of Offender Rehab. et al.,* C.A. No. 80–179–MAC (M.D.Ga.1980). The defendants have tentative-

ly acknowledged that the Georgia scheme does not comport with the holding of *Vitek. See,* Letter to Hon. Wilbur D. Owens, the presiding judge in that case, from counsel for both parties dated October 10, 1980; Atlanta Constitution, Oct. 17, 1980, at 1, col. 6.

tal of criminal charges.[15] But unlike M'Naghten, insanity acquitees are entitled to a state–initiated hearing to determine their present mental state following an initial and brief observation period.

## B
## BURDEN OF PROOF AT THE COMMITMENT HEARING

Although § 27–1503 is silent on the allocation of the burden of proof and the quantum of proof at a release hearing, the Georgia Supreme Court has filled in the gap. In *Clark v. State, supra*, the Court thrust the burden on the patient seeking release, who must prove by a preponderance of the evidence at the release hearing that he no longer meets the criteria for commitment set out in Chapter 88–5. 245 Ga. at 643–46, 266 S.E.2d 466. Here, the Court must decide whether the *Clark* holding should apply–or can constitutionally be applied–to the commitment hearing.

*Clark* premised its holding on the legal maxim that the moving party bears the burden of proof in all civil cases and on the presumption of continued insanity.

The former justification is superficial, a rationale conspicuously unencumbered by a judicious weighing of the rights at stake. Since under Section III. A., above, the State will be required to initiate the commitment hearing, the justification requires no further comment.[16]

The presumption of insanity is again relied on, this time to justify thrusting the burden of proof on the insanity–acquitee. Again, the Court will defer a fuller discussion of the presumption until Section III. C. *infra*, involving the constitutionality of the presumption's invocation as evidence at the hearing. It is one thing to utilize a presumption as evidence, but a wholly different matter when the presumption serves as a justification for the allocation of the burden of proof. In the former sense, the presumption operates solely to shift the burden of coming forward with evidence– the burden of production. The existence of fact A (the verdict of not guilty by reason of insanity) is evidence of the existence of fact B (the insanity-acquitee is currently insane). In the latter sense, the presumption operates to cast the burden of persuasion on one party. That party's failure to prove his case by the requisite quantum of proof (e. g., by a preponderance of the evidence; by clear and convincing evidence; beyond a reasonable doubt) will authorize the fact finder to rule against that party. *See generally*, McCormick's Handbook of the Law of Evidence, §§ 343, 345 (2d ed. 1972 & Supp. 1978); Fed.R.Evid. 301.[17]

---

**15.** In *United States ex rel. Schuster v. Herold*, 410 F.2d 1071, 1079 (2d Cir. 1969), the Court revealed some "grisly" statistics about the mental hospital population in New York:

Matteawan has 119 inmates who have been confined there since 1935, 29 since 1925, and 4 patients who have been there since at least 1915–over half a century.... [A]s of November 1, 1965, one inmate, then 83 years old, had been at Matteawan since 1901.... [A]nother individual was accused of stealing a horse and buggy in 1905 .... [and] was released 59 years later at the age of 89 because he was no longer a menace to society or other patients ... [Another patient] wrongfully [spent] 24 years in Dannemora because he had stolen candy valued at $5.00 at the age of 16.

**16.** It is worth noting, however, that the Georgia Court cited §§ 88–501(u) and 88–2502(p) for the proposition that the rules of evidence applicable in civil cases shall apply in M.H.C. commitment and release hearings, and thus the burden must be shouldered by the moving par-

ty, i. e., the patient. Both of those sections state: "the burden of proof shall be upon the party seeking treatment of the patient. The standard of proof shall be by clear and convincing evidence." The Court's instinctive citation of these sections is proper. The conclusion it draws is inexplicable.

**17.** The distinction between the possible roles played by the presumption is particularly difficult to discern in this case since as an evidentiary presumption, the device focuses on the ultimate question in the case: present mental capacity.

In defendants' Supplemental Brief, pp. 3–4, they suggest that the burden should be on the State to prove by clear and convincing evidence that the insanity–acquitee was a person needing involuntary treatment, but that the "long–standing" presumption of continuing insanity would apply. If neither party presented any evidence at the hearing (except the fact that the insanity–acquitee is an insanity–acquitee), the patient could lose since the presump-

For the same reasons that the presumption is an inadequate predicate for compelling the patient to apply for a commitment hearing, it fails to justify placing the burden of proof on the patient at the state–initiated commitment hearing.[18] Assuming the accuracy of the presumption–that a mental state once proved continues to exist–that which is presumed does not satisfy the criteria of M.H.C. commitment. The presumption, then, does not reflect a relevant difference between M.H.C. committees and .insanity–acquitees, and does not justify the different allocation of the burden of proof.[19]

Other courts have relied on a variety of different theories to justify placing the burden of proof on the insanity–acquitee. In *In re Franklin, supra,* the Court pointed to the prior judicial hearing (the criminal trial) as the relevant distinction. Similarly, in *Jones v. United States,* 396 A.2d 183 (D.C. 1978) *vac. on rehearing en banc on other grounds,* D.C.App., 411 A.2d 624 (1980), the Court compared an M.H.C. committee's hearing to a de novo determination of mental illness, in contrast to an insanity–acquitee's commitment hearing which was more of "an updating process". *Id.* at 189. *See also, Chase v. Kearns, supra; Mills v. State,* 256 A.2d 752, 758 (Del.1969). But this logic, like the reliance on the presumption, ignores the irrelevance of the findings rendered by the criminal court to the determination which must be made by the committing court.

In *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), the Court examined Indiana's procedure for committing defendants who were incompetent to stand trial. The Court held that these committees were entitled to the same procedural safeguards afforded other committees. Relying on *Baxstrom, supra,* the Court stated,

> If criminal conviction and imposition of sentence are insufficient to justify less procedural and substantive protection against indefinite commitment than that generally available to all others, the mere filing of criminal charges cannot suffice. . . . [B]y subjecting Jackson to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses ... deprived petitioner of equal protection of the laws under the Fourteenth Amendment.

*Id.* at 724, 730, 92 S.Ct. at 1851, 1854. If criminal charges and criminal convictions do not sufficiently distinguish the plaintiffs in *Baxstrom* and *Jackson* from M.H.C. committees, then certainly, a criminal acquittal will not pass muster. *State v. Krol,* 68 N.J. 236, 344 A.2d 289, 297 (1975); *Cf. People v. McQuillan,* 392 Mich. 511, 221 N.W.2d 569 (1974).

In *Waite v. Jacobs,* 475 F.2d 392 (D.C.Cir. 1973), the Court examined the release procedures prescribed by the D.C. insanity–ac-

---

tion, unrebutted, authorizes a finding that the patient is presently mentally ill. The State could sustain its burden of presenting clear and convincing evidence of present insanity without introducing a scintilla of further evidence.

**18.** The reasoning of *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), which upheld the practice of requiring the defendant in a criminal trial to prove by a preponderance of the evidence the affirmative defense of "extreme emotional disturbance" is inapplicable in this context. The basis of that decision was that due process required only that all elements of the crime be established by the State, not the nonexistence of affirmative defenses. *Id.* at 210, 97 S.Ct. at 2327; *Cf. In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The same reasoning applied in *Leland v. Oregon,* 343 U.S. 790, 72

S.Ct. 1002, 96 L.Ed. 1302 (1952) (upholding the procedure of placing the burden of proving insanity on the defendant at a criminal trial). At a commitment hearing for an insanity–acquitee, the question of mental illness is fundamental, and not a defense. Furthermore, neither *Leland* nor *Patterson* were concerned with equal protection issues.

**19.** Even if the presumption were 99% accurate, it would not justify a lesser burden of proof on the State. If a certain class of criminal defendants with certain characteristics were found guilty in 99% of their trials (thereby giving rise to a presumption of all class members' guilt in future trials) the State would still have to sustain its burden of proof in all subsequent trials of class members with those characteristics.

quitee statute. Relying on *Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), the Court, in dictum, implied that procedural discrimination in commitment procedures between insanity-acquitees and M.H.C. committees may be justified. In *Humphrey,* the Supreme Court questioned the validity of the re-commitment procedures for Wisconsin Sex Crimes Act committees. The Court stated:

Respondent seeks to justify the discrimination [between Sex Crimes Act recommitment hearings and M.H.C. recommitment hearings] on the ground that commitment under the Sex Crimes Act is triggered by criminal conviction; that *such commitment is merely an alternative to penal sentencing*; and consequently that it does not require the same procedural safeguards afforded in a civil commitment proceeding. *That argument arguably has force with respect to an initial commitment under the Sex Crimes Act,* which is imposed in lieu of sentence, and is limited in duration to the maximum permissible sentence.

*Id.* at 510–11, 92 S.Ct. at 1052–53 (emphasis supplied). *Waite* interpreted this language to permit procedural discrimination at the commitment stage. This Court cannot accept this interpretation for two reasons. First, the recent Supreme Court decision in *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) specifically held that persons convicted of crime could not be transferred to mental hospitals as "an alternative to sentence." Consequently, the dictum in *Humphrey* was discarded by *Vitek,* and cannot be said to sanction initial commitment discrimination.

■ Second, *Waite* ignored the fundamental difference between Sex Crimes Act committees and insanity-acquitee committees. The Court noted,

Insofar as the initial commitment is concerned, we can perceive little difference between Humphrey and an acquitee.... The circumstance that Humphrey was committed in lieu of sentence, while an acquitee is committed 'in lieu of conviction' does not detract from the essential similarity of the two commitments.

475 F.2d at 398. Whatever the "essential similarities" may be, the essential dissimilarity is that Humphrey was found *guilty.* He was found *responsible* for criminal acts, and as such, was subject to the State's police power and its deterrent, punitive, and retributive designs. An insanity-acquitee is an acquitee.

Having decided that the State must initiate the commitment hearing and must sustain the burden of proof, it must be determined what level of proof is required to commit the insanity-acquitee.

In *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) the Court decided that the "clear and convincing" standard was required by the Due Process Clause of the Fourteenth Amendment in an M.H.C. commitment hearing.[20] Recognizing that the interests of the individual to be free from unwarranted commitment required a standard more rigorous than "a preponderance of the evidence," but that the imprecision of psychiatric diagnosis rendered the "beyond a reasonable doubt" standard impractical, the Court adopted the intermediate standard.

In *United States v. Brown,* 478 F.2d 606 (D.C.Cir.1973), the Court upheld the D.C. commitment scheme which arguably imposed a lesser burden of proof on the state in insanity-acquitee commitment hearings than in M.H.C. commitment hearings.[21]

**20.** Georgia applies this standard in M.H.C. commitments. Ga.Code § 88–501(u).

**21.** At the time that *Brown* was decided, the D.C. courts applied a "preponderance of the evidence" test in both insanity-acquitee and M.H.C. commitment hearings. The plaintiff argued that the standard for M.H.C. commitments, in light of recent developments in the Supreme Court, had to be "beyond a reasona-

ble doubt," and consequently the equal protection clause required that insanity-acquitees also be afforded the same protection. Later in 1973, the Court did decide that the standard of commitment in M.H.C. hearings was "beyond a reasonable doubt". *In re Ballay,* 482 F.2d 648 (D.C.Cir.1973). The D.C. Courts subsequently reduced the standard to "clear and convincing evidence." *In re Nelson,* 408 A.2d 1233 (D.C. App.1979).

The fulcrum of the decision was the finding that "modern standards of the insanity defense, not restricted to those who do not know right from wrong call for the acquittal of persons who 'may have meaningful elements of responsibility.'" *Id.* at 611, citing *Dixon v. Jacobs*, 427 F.2d 589, 601–603 (D.C.Cir.1970) (concurring opinion). These "meaningful elements of responsibility", the Court held, distinguish the insanity–acquitee and the M.H.C. committee and justify the imposition of different burdens of proof at their commitment hearings. *See also, Waite v. Jacobs*, 475 F.2d 392, 396 (D.C.Cir.1973). In short, *Brown* held that insanity–acquitees could be punished.

To punish an insanity–acquitee, or to utilize a procedure which includes a punitive component, runs counter to the overwhelming authority that an insanity–acquitee is not responsible, and not properly subject to punishment. *Warren v. Harvey*, 472 F.Supp. 1061, 1068 (D.Conn.1979) ("Once petitioner was acquitted, even by reason of his insanity, his criminal responsibility for his past acts was at an end."); *Cameron v. Mullen*, 387 F.2d 193, 198 n. 13 (D.C.Cir. 1967) ("Unlike sentence or probation, commitment is not punitive."); *United States v. Ecker*, 479 F.2d 1206, 1211 (D.C.Cir.1973) ("Ecker was not found to be legally responsible for his acts, he was not convicted, and he is not being punished."); *Hough v. United States*, 271 F.2d 458, 462 (D.C.Cir.1959) ("the individual is confined in the hospital for the purpose of treatment not punishment.... Any preoccupation ... with the need of punishment for crime is out of place in dealing with an individual who has been acquitted of the crime charged."); *Holloway v. United States*, 148 F.2d 665, 666 (D.C.Cir.1945) ("Our collective conscience does not allow punishment where it cannot impose blame"); *Douglas v. United States*, 239 F.2d 52 (D.C.Cir.1956) ("that one who commits a wrong by reason of insanity

must be acquitted is so well–settled that no one questions it.... Only the guilty are to be punished.") *Ragsdale v. Overholser*, 281 F.2d 943, 947 (D.C.Cir.1960) ("No penal or punitive considerations enter into this procedure. It has two purposes: (1) to protect the public and the subject; (2) to afford a place and a procedure to rehabilitate and restore the subject as to whom the standards of our society and the rules of law do not permit punishment or accountability.") *State v. Shackford*, 262 A.2d 359, 366 (Me. 1970) ("He became one who is to be held blameless and free from punishment for an act otherwise subject to criminal sanctions."); *State v. Krol*, 68 N.J. 236, 344 A.2d 289, 295 (1975) ("[A]lthough such a verdict implies a finding that defendant has committed the *actus reus*, it also constitutes a finding that he did so without a criminal state of mind. There is, in effect, no crime to punish."). *But see*, cases cited in A. Goldstein, The Insanity Defense, 153 n. 21 (1967) (*e. g.*, the insanity–acquitee should not go "unwhipped of justice."). The Georgia Courts have consistently exonerated the insanity–acquitee of all responsibility. *See e. g.*, *Bailey v. State*, 210 Ga. 52, 55, 77 S.E.2d 511 (1953) ("A person confined to an asylum or a hospital for the insane, after his acquittal on the ground of insanity, is not to be considered as a criminal undergoing punishment."); *Drewry v. State*, 208 Ga. 239, 241, 65 S.E.2d 916 (1951) ("A person is 'insane', and hence not criminally responsible, when he or she does not have reason sufficient to distinguish between right and wrong ...").

These Courts are not engaged in mere ipse dixitism. Even prior to *M'Naghten's Case* in 1843, Courts recognized that no valid purpose would be furthered by holding the insanity–acquitee accountable for his acts. The insanity defense is a recognition that none of the theories which under-

---

In 1970, after the hearing that led to the plaintiff's commitment which was the subject of the *Brown* decision, Congress shifted the burden to the insanity–acquitee at the commitment hearing. D.C. Court Reform & Criminal Procedure Act of 1970, Pub.L.No. 91–358, 84 Stat. 473–668. 24 D.C.Code § 301(d)(1)(2) &

(e) (Supp. V 1972). The Court has not found any case addressing the constitutionality of that amendment. *Cf. U. S. v. Jackson*, 553 F.2d 109, 116 n. 13 (D.C.Cir.1976); *Jones v. United States*, 396 A.2d 183, 186 n. 3 (D.C.App. 1978).

lie our criminal law–prevention, restraint, rehabilitation, deterrence, education, and retribution–are furthered by punishing the insane. *See generally,* W. LaFave, A. Scott, Handbook on Criminal Law, § 36, pp. 271–272; A. Goldstein, The Insanity Defense, pp. 11–15 (1967) ("[U]nderlying [the themes of criminal law], as the single constant element, is the concept of blame. Because it is widely assumed that "blame" plays a critical role in maintaining individual responsibility and social order, the insanity defense continues to be regarded as exceptional. It becomes the occasional device through which an offender is found to be inappropriate for the social purposes served by the criminal law. He is too much unlike the man in the street to permit his example to be useful for the purposes of deterrence. He is too far removed from normality to make us angry with him. But because he is sick rather than evil, society is cast as specially responsible for him and obligated to make him better."); Weihofen, The Urge to Punish (1956); American Law Institute, Model Penal Code, Tentative Draft No. 4, p. 156 (1955) ("What is involved specifically is the drawing of a line between the use of public agencies and public force to condemn the offender by conviction, with resultant sanctions in which there is inescapably a punitive ingredient (however constructive we may attempt to make the process of correction) and modes of disposition in which that ingredient is absent, even though restraint is involved. To put the matter differently, the problem is to discriminate between the cases where a punitive–correctional disposition is appropriate and those in which a medical–custodial disposition is the only kind that the law should allow.")

The holding in *Brown* is based on the finding that the "modern standards of insanity" do not absolve the defendant of responsibility.[22] To what extent Chief Judge Bazelon's pioneering decisions in *Durham v. United States,* 214 F.2d 862 (D.C.Cir.1954) and *United States v. Brawner,* 471 F.2d 969 (D.C.Cir.1972) may have had this effect, this Court need not decide. The sets of *Durham/Brawner* insanity–acquitees and *M'Naghten* insanity acquitees are not mutually exclusive. But *Brawner* acquitees who are not *M'Naghten* acquitees exhaust the set of insanity–acquitees who can be held responsible for their acts. In short, there can be no *M'Naghten* acquitees who can be held responsible, and thus dealt with more harshly than M.H.C. committees.

The reasoning of the Court in *Addington* applies to insanity–acquitees with equal force. *Cf. Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). In *Warren v. Harvey,* 472 F.Supp. 1061, 1071 (D.Conn.1979), the Court concluded that *Addington,* concerned as it was with M.H.C. commitments, had no relevance to the insanity–acquitee's hearing. The District Court relied, instead, on the dictum in the earlier Supreme Court case of *Lynch v. Overholser,* 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962).[23] *Cf. State v. Wilcox,* 92 Wash.2d 610, 600 P.2d 561, 562–63 (1979)

---

**22.** The holding in *Brown* is somewhat vindictive. Justice Rosellini, dissenting in *Alter v. Morris,* 85 Wash.2d 414, 536 P.2d 630, 639 (1975) observed,

> The reasoning [in *Brown* ] appears to be: The State proved the defendant did the criminal act, but he has escaped punishment by proving that he was insane at the time. It is only fair and just that he should receive some punishment–and confinement in a mental institution is appropriate punishment.... I do not find the holding of that case persuasive.

**23.** Justice Harlan, while invalidating the automatic commitment procedure for those insanity–acquitees who had not raised the defense, but had it thrust upon them, distinguished the "voluntary" insanity acquitee's circumstance:

> Congress might have thought, however, that having successfully claimed insanity to avoid punishment, the accused should then bear the burden of proving that he is no longer subject to the same mental abnormality which produced his criminal acts. Alternatively, Congress might have considered it appropriate to provide compulsory commitment for those who successfully invoke an insanity defense in order to discourage false pleas of insanity. We need go no further here than to say that such differentiating considerations are pertinent to ascertaining the intended reach of this statutory provision.
>
> *Id.* at 715.

(ignoring *Addington* ). This Court views the unbroken line of Supreme Court cases, which, although not precisely on point, evidence an acute awareness and increasing concern for the rights of the allegedly mentally ill, be they M.H.C. committees, prisoners, those found incompetent to stand trial, Sex Crime Offenders, or insanity–acquitees, as more persuasive. *Baxstrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966); *Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967); *Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). This Court is not afflicted with the judicial myopia which seems to have burdened the Court in *Warren*. It is inconceivable that the *Lynch* dictum (which did not even address the Constitutional issues) has any vitality in light of the dramatic advances the Court has made to protect the rights of the mentally ill.

Dissenting in *United States v. Brown*, 478 F.2d 606, 612–15 (D.C.Cir.1973), Judge Skelly Wright wrote,

> *Bolton* and *Baxstrom* stand for a basic proposition that a proven history of past dangerousness or illness, while certainly admissible in evidence, may not be used as an excuse to abrogate or change well recognized safeguards, including burden of proof, in civil commitment proceedings, or their equivalent, to determine present dangerousness or illness. . . . [A]cquittal by reason of insanity says precious little on the question whether a person presently suffers from mental illness. . . . As I have always understood the issue of burden of proof, the standard we adopt reflects our view as to the risk of error we are willing to accept in our judgments. A heavy burden of proof in criminal cases, for example, reflects our belief that, given the consequences of conviction, only a minimal chance of error will be tolerated, that it is better to risk

letting culpable defendants go free as the price of ensuring that those not culpable will be acquitted to the greatest extent possible. In civil commitment cases the majority seems prepared to concede that this logic–basically, our abhorrence of wrongful incarceration–dictates a greater burden of proof than "preponderance of evidence" as to the relevant issues of illness and dangerousness. But with respect to those acquitted of criminal charges by reason of insanity, my brethren pull back. They do this notwithstanding the teaching of *Baxstrom* and *Bolton* and in spite of the fact that the prior judgment of acquittal speaks in muted tones at best to the central question of current illness.

*Id.* at 613–14.

In sum, with respect to the commitment of insanity–acquitees, the State must initiate a commitment hearing at which it must sustain the burden of proving, by clear and convincing evidence, that the insanity–acquitee presently meets the criteria for M.H.C. commitment.

### C

### THE PRESUMPTION OF CONTINUED INSANITY

Georgia Code § 38–118 provides, "Other presumptions of law, such as of . . . a mental state once proved to exist . . . may be rebutted by proof." The origin of this presumption predates the mid–nineteenth century codification of Georgia law. The first reported case to introduce the presumption into the jurisprudence of Georgia is *Dicken v. Johnson*, 7 Ga. 484 (1849). The Court was confronted with the question "what is that insanity which, when proven to exist previous to the act, will cast upon the defendant the burthen of proving a lucid interval at the time of the act." 7 Ga. at 490. The plaintiff, attempting to rescind a deed, established that he was an habitual drunkard, and sought to cast the burden of proving capacity to convey upon the grantee. The Court held that only *habitual* or *fixed* insanity would trigger the presumption.

The Court further held that the requisite *degree* (in addition to duration) of insanity which would be needed to rescind the deed in equity must be proved to have existed earlier, in order to generate the presumption. *Id.* at 491. The wisdom of this case seems to have been lost over the subsequent decades. Today, regardless of the degree or duration of the mental illness and regardless of the antisocial act committed, the insanity–acquitee–once found to have lacked the mental capacity at an earlier time to distinguish right from wrong with respect to one particular act–is presumed to be mentally ill and (1) a person who presents a substantial risk of imminent harm to himself or others as manifested by either recent overt acts or recent expressed threats of violence which present a probability of physical injury to himself or others or (2) is so unable to care for his own physical health and safety as to create an imminently life–endangering crisis.

 In order to explain the basis of the presumption, courts have had trouble doing more than merely reiterating it, commenting on its "self–evident legitimacy." *See e. g., Clark v. State,* 245 Ga. at 644, 266 S.E.2d 466 ("Code § 38–118's presumption of the continuation of this mental state comports with due process, because it is rational to assume that, once a mental state is proven to exist, it continues to do so in the absence of evidence to the contrary); [24] *Waite v. Jacobs, supra* at 400 ("It comports with normal perceptions of reality–and hence is rational–to assume that, once a given status is proven to exist, it continues to do so...."); *State v. Kee,* 510 S.W.2d 477, 480 (Mo.1974) ("When this type of conduct is engaged in as a consequence of a mental defect, it is reasonable to believe that it may be repeated until the defendant is cured."); *See also, State v. Allan,* 166 N.W.2d 752, 758 (Iowa 1969).

Although the presumption has garnered wide acceptance among jurists, the literature emanating from the medical profession indicates that the presumption is not based on valid scientific evidence. *Punishing The Not Guilty* at 1024–25, nn. 58–61; *State v. Krol,* 344 A.2d 289, 295 n. 2 *and studies cited therein* (N.J.1975); deposition of Dr. Timothy Bullard, pp. 37–38, 42, 51–52. Significantly, the presumption does not apply to M.H.C. committees.[25] When an M.H.C. committee applies for release–within six months of his initial commitment–there is no operative presumption that he remains mentally ill. The psychology literature establishes that insanity–acquitees are no more dangerous than M.H.C. committees. *See,* Weihofen, *Institutional Treatment of Persons Acquitted by Reason of Insanity,* 38 Tex.L.Rev. 849, 855–58 *and studies cited therein* (1969); *State v. Krol, supra,* 344 A.2d at 295 n. 2. Indeed, the presumption only concerns the mental state of the individual. Even disregarding the obvious fact that the mental incapacity to distinguish right from wrong is not congruent with mental illness,[26] it does not, by its own

---

**24.** For a statutory presumption to pass constitutional muster, it must be shown with *"substantial assurance* that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." *Leary v. United States,* 395 U.S. 6, 36, 89 S.Ct. 1532, 1548, 23 L.Ed.2d 57 (1965) (emphasis supplied). Even if the presumption were "rational"–which it is not–it would not satisfy this requirement of due process.

**25.** Of course, at an M.H.C. commitment hearing, there usually will not have been a prior determination of mental illness, and thus no basis for the presumption. If there had been such a prior determination, as in the case of an individual who went to court to rescind a deed, there still would be no presumption of continu-

ing insanity, even if the court found him incapable of conveying property.

**26.** Mental illness is defined as "a disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." Ga.Code § 88–501(a).

The Court has already noted that the not guilty by reason of insanity verdict is not equivalent to a finding that the individual is mentally ill and in need of involuntary treatment. *See, supra* at 1058. In a number of states, the jury at the criminal trial makes an independent finding of *present* mental illness. *See e. g., State v. Gebarski,* 280 N.W.2d 672, 673 n. 1 & 678 (Wisc.1979); *State v. Wilcox,* 92 Wash.2d 610, 600 P.2d 561, 563, n. 1 (Wash.1979). Courts

terms, constitute evidence that the individual presents a substantial risk of imminent harm to himself or others–the second criterion for M.H.C. commitment.

Furthermore, the purported difference between M.H.C. committees and insanity–acquitees–that the former is only potentially dangerous, while the latter has already manifested his dangerous propensity [27]–is inaccurate in two respects. First, not all insanity–acquitees have committed acts which constitute "harm to themselves or others" or "physical injury to themselves or others." In *Overholser v. O'Beirne*, 302 F.2d 852, 861 (D.C.Cir.1962) the Court examined the D.C. criteria for commitment– mental illness and "dangerous to himself or others"–and decided that, "to describe the theft of watches and jewelry as 'non–dangerous' is to confuse danger with violence.... [A] 'bad check' passer at large endangers himself by exposure to additional violations and additional arrests, trials and confinements, to say nothing of the serious effect on the public of his predatory tendencies." *Accord, Overholser v. Russell*, 283 F.2d 195 (1960). Although the wisdom of this holding is questionable, *see*, Hamann, *The Confinement and Release of Persons Acquitted By Reason of Insanity*, 4 Harv.J. Legisl. 55, 84–85 (1966), this Court need not address the issue. In Georgia the test is not "dangerousness", but risk of *physical injury*. Ga.Code § 88–501(v). An individual *found not guilty by reason of insanity of the criminal charge of theft by taking or "bad check passing" has not manifested a substantial risk of inflicting physical injury on himself or others.*

The second flaw in the purported distinction between M.H.C. committees and insanity–acquitee committees is the failure to recognize that the M.H.C. committee *has*, by the statutory definition, manifested his dangerous propensity. Thus, while an in-

sanity–acquitee may have evidenced *no* propensity to inflict physical harm, the M.H.C. committee *has* committed such overt acts, or recently expressed threats of violence. Yet the insanity–acquitee must overcome the presumption, and the M.H.C. committee does not.

The distinction between the circumstances of the M.H.C. committees and the insanity–acquitees is further blurred in light of Ga.Code § 88–504.3: "A peace officer may take any person to a physician within the county ... or to [a hospital] if (a) the person is committing a penal offense, and (b) the peace officer has probable cause for believing that the person is a mentally ill person requiring involuntary treatment." Consequently, many M.H.C. committees have committed criminal acts, but have escaped the criminal justice system solely by virtue of the policeman's discretion. Professor Goldstein found that the policeman's decision to bring the mentally ill to the hospital rather than the police station is "genuinely competitive with the criminal process." A. Goldstein, The Insanity Defense, 172 (1967). This discretion also operates at the prosecutorial stage of the proceedings, the prosecutor deciding to forego criminal proceedings in favor of civil commitment proceedings. *See, Dixon v. Jacobs*, 427 F.2d 589, 603 (D.C.Cir.1970) (Leventhal, J., concurring); *Alter v. Morris*, 85 Wash.2d 414, 536 P.2d 630, 635–644 (1975) (Rosellini, J., dissenting in part). In light of the absence of any relevant difference between M.H.C. committees and insanity–acquitees, the tautological justification for the presumption in the latter's hearing lacks rational support. To the extent that there is a difference between the classes, it would be more rational to employ the presumption at the M.H.C. committee's hearing–he, at least, has unquestionably committed overt acts evidencing a risk of violent conduct.

---

have invalidated such procedures on the basis that requiring the defendant to prove past insanity and present sanity at the same trial is overly burdensome and violates due process. *State v. Krol, supra*, 344 A.2d at 304; *Wilson v. State*, 259 Ind. 375, 287 N.E.2d 875, 880 (Ind. 1972).

**27.** *See e. g., State v. Alto*, 589 P.2d 402, 406 (Alaska 1979); *Chase v. Kearns*, 278 A.2d 132, 138 (Me.1971); *In re Franklin*, 7 Cal.3d 126, 101 Cal.Rptr. 553, 496 P.2d 465, 472 (1972).

■ In *State v. Krol, supra,* the Court held,

[A] defendant who, despite the fact he still suffers some degree of mental illness, poses no significant danger to society, may nevertheless be deprived of liberty for an indefinite period of time because dangerousness is, in effect, presumed from continuing insanity. The problem is most acute when the offense which defendant has committed is one which, although violating social norms, did not itself involve dangerous behavior. But even where ... the crime is a violent one, the procedure contains great potential for individual abuse.

*Id.* 344 A.2d at 295–96. Similarly, in *People v. McQuillan,* 392 Mich. 511, 221 N.W.2d 569, 580 (1974) the Court observed,

Those committed civilly in the State of Michigan receive a determination of mental illness which attains far more certainty than any inference of insanity. Where the state has provided a full range of judicial protection to determine the competency of all civilly committed, it may not deny those rights to a person found not guilty by reason of insanity.

The presumption of continued insanity, if left unrebutted, would suffice to institutionalize the insanity–acquitee. Like the M.H.C. committee, the insanity–acquitee is entitled, as a matter of equal protection, to a judicial determination which attains a greater degree of certainty than that generated by a scientifically unsupported presumption.

### D

### CRITERIA FOR COMMITMENT

Plaintiffs challenge committing courts' practice of relying on evidence which is not in the record, and disregarding uncontradicted medical testimony. *See e. g., Pennewell v. State,* 148 Ga.App. 611, 251 S.E.2d 832 (1979); *Pitts v. State,* 151 Ga.App. 691, 261 S.E.2d 435 (1979); *Dubose v. State,* 148 Ga.App. 9, 251 S.E.2d 15 (1978).

The two elements required for both M.H.C. and insanity–acquitee commitment are mental illness and substantial risk of imminent harm. If either element is absent with respect to an M.H.C. committee, he cannot be committed.

The major difficulty in deciding whether an insanity–acquitee meets the criteria for M.H.C. commitment is · determining what weight should be given to the anti–social act which led to the insanity–acquitee's prosecution. The plaintiffs do not argue, and no court has held, that the committing court must ignore the act. However, the insanity–acquitee's conduct, by itself, cannot support commitment. It must first be decided whether the person is presently mentally ill, and whether the act manifests a substantial risk of imminent harm to himself or others. Naturally, if the individual was acquitted of the charge of murder,. his situation is different from that of an individual acquitted of the charge of passing bad checks. Also relevant is the time which has elapsed since the act was committed. *Warren v. Harvey,* 472 F.Supp. 1061, 1070–71 (D.Conn.1979).

■ This Court cannot dictate to the Courts of Georgia how the decisions in these cases are to be made. But two constitutionally guaranteed rights must be afforded insanity–acquitees. First, under the due process and equal protection clauses, an insanity–acquitee cannot be committed if he is either not dangerous or not mentally ill. The Georgia Legislature has specifically provided this in § 27–1503. Second, as a matter of equal protection, the evidence which is admissible and inadmissible at an M.H.C. committee's hearing, and the weight which is attached to certain evidence must be the same at an insanity–acquitee's hearing.

■ With respect to the criteria for commitment, it is clear that mental illness, without more, is not a sufficient basis for depriving an individual of liberty. *O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975). This applies equally to those who have been previously subject to criminal prosecution and those who have not. Similarly, an individual who is dangerous, but not mentally ill,

cannot be committed for the purpose of preventive detention. *Cf. Millard v. Harris,* 406 F.2d 964, 985 n. 14 (D.C.Cir.1968) (Wright, J., concurring); *Salinger v. Superintendent of Spring Grove St. Hosp.,* 206 Md. 623, 112 A.2d 907, 911 (1955); Note, *Standards of Mental Illness in the Insanity Defense and Police Power Commitments: A Proposal for a Uniform Standard,* 60 Minn.L.Rev. 1289, 1298 (1976).

█ The evidentiary questions were resolved in *Powell v. Florida,* 579 F.2d 324 (5th Cir. 1978) which held that, "a judge cannot reject unanimous medical opinion that the insanity–acquitee is not mentally ill when the judge does not have such power in all other civil commitment cases." *Id.* at 332. The import of this holding is clear: the equal protection clause requires that the committing court treat the evidence–its admissibility and weight–the same in M.H.C. commitment hearings and insanity–acquitee commitment hearings. Ga.Code § 88–501(u) provides that the rules of evidence apply in M.H.C. commitment hearings. They must also apply in the insanity–acquitee's commitment hearing.

In assessing dangerousness, the committing court must consider the criminal act committed by the insanity–acquitee in the same way it considers the "overt act" of the M.H.C. committee. In both cases, the past conduct is important as evidence of the probability of future violent conduct. The intervening criminal trial in the case of the insanity–acquitee does not change the nature of the act he committed, or the extent to which it constitutes a manifestation of the acquitee's probability of inflicting injury on himself or others.

█ In sum, the criteria for the commitment of insanity–acquitees must include both mental illness and dangerousness. The admissibility and weight of evidence at a commitment hearing must be the same for insanity–acquitees and M.H.C. committees.

## E

## RELEASE

In *Powell v. Florida, supra,* the Court held "the prior anti–social conduct of an insanity acquitee justifies treating such a person differently from ones otherwise civilly committed for purposes of deciding whether the patient should be released." 579 F.2d at 333. M.H.C. commitment in Florida at the time *Powell* was decided depended on criteria significantly different than the criteria for M.H.C. commitment in Georgia. In Florida, there was no requirement that the committee have committed overt acts evidencing dangerousness, or that he threatened to commit violence. A mere showing that the individual was "likely to injure himself or others if allowed to remain at liberty" was sufficient to warrant the involuntary commitment of a non–insanity–acquitee. Fla.Stat. § 394.467. The holding in *Powell* reflects an essential difference between the M.H.C. committee and the insanity–acquitee in Florida: the latter, but not the former, has committed an anti–social act. The holding has limited application in Georgia where the M.H.C. committee *must have committed an overt act* or expressed threats of violence which present a *probability* of physical injury.

*Powell* was concerned specifically with the Florida statute which, like Ga.Code § 27–1503, requires all insanity–acquitees to obtain an order from the committing court before they could be released. M.H.C. committees in Florida, as in Georgia, could be released by the hospital when the staff determined that the patient was no longer mentally ill.

█ There is no rational basis for withholding from all insanity–acquitees the release procedure available to all M.H.C. committees in Georgia. The difference between the committees in Florida which supported the *Powell* decision does not exist in Georgia. Both have committed acts which constitute evidence of dangerousness. The acts committed by some M.H.C. committees may be more persuasive evidence of dangerousness than the acts committed by some insanity–acquitees.

The Court is cognizant that some M.H.C. committees are institutionalized under

§ 88–501(v)(2): "so unable to care for his own physical health and safety as to create an imminently life–endangering crisis." Certainly, they do not pose a threat of physical harm to others, and have not committed any overt act evidencing a risk of inflicting harm on others. But simply because certain members of the class of M.H.C. committees are not dangerous to others does not alter the basic fact that, in general, M.H.C. committees and insanity–acquitees can be distinguished only by the criminal proceedings which were instituted against the latter. Indeed, many insanity–acquitees have evidenced as little likelihood of inflicting harm on others as § 88–501(v)(2) committees have. Two of the three named plaintiffs in this case were acquitted of crimes which were entirely non–violent theft crimes.

 ■ There is, then, a wide variety of both M.H.C. committees and insanity–acquitees. But there is also one group of insanity–acquitees whose status is substantially different than all M.H.C. committees and all other insanity–acquitees. These are the individuals who have committed acts which are considered violent crimes: murder, rape, armed robbery, arson, aggravated assault, and other offenses of like nature. These individuals can be required to obtain Court approval for release. The equal protection clause does not require that these individuals be treated the same as all others who are involuntarily hospitalized. The initial commitment must be the same for all committees, but the method of obtaining release may differ. Thus, all insanity–acquitees must be afforded a state–initiated commitment hearing at which the state bears the burden of proof. To obtain release, those insanity–acquitees who were not charged with serious violent crimes must be treated the same as all M.H.C.

committees.[28] Those insanity–acquitees who were charged with serious violent crimes may be required to obtain court approval.

 ■ The risks posed by those who have committed serious violent acts entitle the public to a most thorough screening of such individuals before they are released. As one Court observed,

> The determination of dangerousness involves a delicate balancing of society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy. This decision, while requiring the court to make use of the assistance which medical testimony may provide, is ultimately a legal one, not a medical one.

*State v. Krol,* 68 N.J. 236, 344 A.2d 289, 302 (1975). No psychiatrist can predict with certainty whether an individual will commit dangerous acts. Cocozza & Steadman, *The Failure of Psychiatric Predictions of Dangerousness: Clear and Convincing Evidence,* 29 Rutgers L.Rev. 1084 (1976); Diamond, *The Psychiatric Prediction of Dangerousness,* 123 U.Pa.L.Rev. 439 (1974). Since such a determination in terms of absolutes is impossible, society must evaluate the degree of risk it is willing to tolerate. This is a legal, not a medical evaluation. The court cannot ignore the testimony of doctors on the issue of mental illness, *Powell v. Florida, supra,* at 332, and when that evidence is uncontradicted that the patient is not mentally ill, there is no need to inquire into the issue of risk of harm. But when the evidence is ambiguous, the State has a legitimate interest in requiring court approval for the release of those insanity–acquitees charged with serious violent crimes.

---

28. The procedures for the release and continued hospitalization of M.H.C. committees are set out in § 88–506.5 (Supp.1980). No Court approval is necessary if the chief medical officer of the hospital deems the patient no longer in need of treatment. The patient can be retained if, at twelve month intervals, a "Committee for Continued Hospitalization Review"

finds the patient in need of treatment. That determination is reviewed by a Hearing Examiner. The patient is entitled to a full and fair hearing–a hearing which affords the patient all the rights he has at the initial commitment hearing–if he challenges his continued hospitalization.

### F

## RELEASE OF INSANITY ACQUITEES CHARGED WITH SERIOUS VIOLENT CRIMES

Insanity–acquitees who were not charged with serious violent crimes must be treated the same as all M.H.C. committees. The remainder of this opinion deals solely with the procedures for the release of those insanity–acquitees who were charged with serious violent crimes.

In particular, the Court must decide if the one–per year limitation on applications for release is constitutional, and whether the State can require the insanity–acquitee to prove his sanity, rather than requiring the State to prove his insanity.

With respect to the limitation on the frequency of release applications, there is no reason why insanity–acquitees charged with serious violent crimes should be treated different than M.H.C. committees. Consequently, any time that the appropriate hospital personnel believe that the patient no longer meets the criteria for commitment, the releasing court must consider the application for release. If the insanity–acquitee wishes to challenge his continued confinement, but the hospital personnel do not consider the patient ready for release, then, like the M.H.C. committee, the insanity–acquitee can obtain a judicial hearing six months after the initial commitment, and every twelve months thereafter.[29]

■ Limiting the frequency of hospital supported release applications lacks any rational foundation. Conceivably, the court could deny the application, deciding that the requisites for continued commitment are still present. Nevertheless when the hospital has decided that the patient no longer meets the criteria, the court must entertain the release application. The treating physicians' evaluations of the patient will constitute the most persuasive, if not the only evidence on the issue of mental illness. Their testimony will also be relevant, although not dispositive on the risk of harm issue. If their testimony is favorable to the patient's release, and they support release, there is no conceivable reason why the State should deny the patient a hearing. At that point in an M.H.C.'s history, he would be released promptly. If the insanity–acquitee is not afforded a hearing, it must be for some reason unrelated to treatment or public safety. Whatever that reason may be, it does not overcome the right of the insanity–acquitee to be released when the reasons for hospitalization no longer exist. *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972) ("due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.")

■ The allocation of the burden of proof, and the standard of proof at a release hearing are particularly troubling issues. An M.H.C. committee goes to a hearing only after the hospital personnel, and the Review Board, decide that he should not be released. At the hearing, the State must prove by clear and convincing evidence that the M.H.C. committee still meets the criteria for involuntary commitment. Ga.Code § 88–506.5. An insanity–acquitee, however, must go to court regardless of the hospital's position on his application. The hospital staff's assessment of the patient, in most cases, will be dispositive on the issue of mental illness, and will be strongly probative on the risk of imminent harm issue. The doctors' testimony, regardless of which party must bear the burden of proof, frequently will be outcome determinative. It should be remembered that at this point we are dealing solely with insanity–acquitees who were charged with serious violent crimes. They constitute a class which is distinguishable from M.H.C. committees and other insanity–acquitees. The equal

---

**29.** These times reflect the maximum duration for which an M.H.C. patient can be committed.

The Model Penal Code prescribes a similar procedure. If the hospital supports the insanity–acquitee's release, it may petition the court at any time. If the patient, without the support of the hospital, challenges his hospitalization, his application can be filed only at one year intervals. Model Penal Code § 4.08(2) and (5).

protection clause does not require the State to treat these groups identically. The constitution does not permit, however, such a drastic deviation in procedure which currently exists. At most, the equal protection clause permits the State to refuse to shoulder the burden of proof; it cannot cast the burden upon the patient.

In *United States v. Ecker*, 543 F.2d 178 (D.C.Cir. 1976), the Court declared that in conditional release hearings, there simply would be no burden of proof assigned:

> [P]roceedings involving the care and treatment of the mentally ill are not strictly adversary proceedings.... These are truly investigatory proceedings in which traditional notions of proof are simply inapplicable. The [court], the hospital, the patient, and the government share an obligation to elucidate and explore all the relevant facts.

*Id.* at 192–93. Other cases have also decided that to thrust the burden of proof on one party or the other is improper. *Dixon v. Jacobs*, 427 F.2d 589, 598 n. 29 (D.C.Cir. 1970); *Hill v. Florida*, 358 So.2d 190, 208 (Fla.App.1978). These cases were not decided on constitutional grounds—neither due process nor equal protection—but the sagacity of their decisions compels this Court to hold that thrusting the burden on the insanity–acquitee, in light of the contrary provision governing the release of all other patients, lacks any conceivable rationality.

The difficulties confronting the parties in a release hearing will be compounded by assigning the burden of proof. In *Hill, supra*, the Court discussed the difficulties confronting a patient who must prove an absence of mental illness and dangerousness: his confinement hampers his ability to prove that he can exist safely in an unconfined environment, and having previously shown himself to be dangerous, it is "all but impossible for him to prove the negative that he is no longer a menace." 358 So.2d at 203, *quoting, Covington v. Harris*, 419 F.2d 617, 627 (D.C.Cir.1969).

In contrast, in *People v. Howell*, 586 P.2d 27, 30 (Colo.1978), the Court pointed to the difficulties confronting the State:

> Typically one who has already been committed does not have as many opportunities to manifest his dangerousness by acts or threats as were available when he was living unrestrained in the outside world. The institutional environment offers routines, restrictions and discipline which may be unavailable to the patient in the outside world. Moreover, most opportunities to act out hostile impulses are obviated by security and isolation measures in the institution.... The absence of overt acts may only reflect successful restraint by the institution and may be no indication of the patient's lack of dangerousness if released from that environment.

The Court decided that the burden, therefore, should be on the patient seeking release.[30] Upon a similar premise, however, the D.C. Circuit decided that the burden should not be assigned specifically to either party:

> It may be true that the limbo of hospital life prevented the sort of tensions toward women that have plagued appellant in the past from building up. But by the same token it was by the Government's choice, and not his, that he has no greater opportunity to prove his self–control.[31]

*Millard v. Harris*, 406 F.2d 964, 978 (D.C.Cir. 1968).

■ In *Lublin v. Central Islip Psychiatric Center*, 56 A.D.2d 1, 391 N.Y.S.2d 603 (Sup.Ct., App.Div.1977), the Court decided that requiring the patient to prove by a preponderance of the evidence that he was not presently dangerous to himself or to

**30.** The holding in *Howell* is somewhat ambiguous. The Court stated, "Thus when [the insanity–acquitee] seeks release claiming he is no longer dangerous, *and* the hospital ... disagrees, it is neither unfair nor irrational to require that he bear the burden of proving he is no longer dangerous to himself or others." 586

P.2d at 31. (emphasis added). It is unclear whether the patient has the burden of proof if the hospital agrees that he should be released.

**31.** The patient in *Millard* was committed to the hospital pursuant to the D.C. Sexual Psychopath Act, not as an insanity–acquitee.

others as a condition of release was constitutionally impermissible under the due process clause. This Court holds simply that as a matter of equal protection, if the State must bear the burden in M.H.C. release hearings, then it cannot completely shift that burden to the patient who was acquitted of a serious violent crime by reason of insanity. At most, a shared burden–a mutual effort to construct an adequate record–is permissible.

 In closing this discussion of the release procedure, it should be noted that what was said in section III. D. has equal application in this context. The weight and admissibility of evidence must be the same at an M.H.C. release hearing and an insanity–acquitee release hearing. In *Powell v. Florida, supra,* the Court observed,

> The basis for commitment of an individual acquitted by reason of insanity is his "dangerousness" to society. In determining the existence of that dangerousness a court should focus upon the patient's behavior and must predict whether that behavior demonstrates that the patient, if released, would pose a substantial threat of harm to himself or others. While an initial commitment of an acquitee may well focus upon the crime committed, the release of an individual committed by reason of insanity more properly looks to that individual's behavior since the crime to determine whether or not his recent behavior demonstrates his continuing dangerousness.

579 F.2d at 333 n. 10. One criterion for commitment (initial and continued) is a recent overt act or an expressed threat of violence evidencing the probability of inflicting injury on himself or others. This component of the test must be applied equally to M.H.C. committees and insanity–acquitees. The releasing court cannot rely simply on the criminal act–no matter how brutal–to find present dangerousness. This is not to say that the act must be disregarded; it is relevant, but not to the exclusion of all other evidence. In *Warren v. Harvey,* 472 F.Supp. 1061, 1070–71 (D.Conn.1979), the Court properly assessed the weight

which should be given to the criminal act at the release hearing:

> While an insanity acquittal may be uncontroverted evidence of prior violent conduct of the individual, its probative value in predicting *future* dangerousness depends in large part on how far in the past the violent act occurred.... As the past act becomes more and more remote, the courts should increasingly focus on the recent overt acts, threats or attempts of the insanity acquitee. Otherwise the acquitee will be forced to serve a life sentence on the basis of a past act for which he was not found legally responsible.

This is the type of approach which appears to be statutorily required in evaluating M.H.C. committees. It must, therefore, be the approach in evaluating insanity–acquitees.

G

TRANSFERS

 The plaintiffs challenge the provision of § 27–1503 which prohibits the transfer of insanity–acquitees from one hospital to another without court approval. Obviously, all mental health patients are entitled to the most appropriate care and treatment which their condition warrants. No consideration of punishment may enter into the determination of the proper rehabilitative steps which should be taken. However, if the hospital determines that the most appropriate treatment plan involves a conditional release or a transfer to a facility with minimal security, then this Court's discussion of the release procedures will apply. For all insanity–acquitees who were charged with crimes other than those involving serious violent acts, the equal protection clause requires the same procedure as that afforded all M.H.C. committees. Those insanity–acquitees who were charged with the serious violent crimes must obtain court approval before their transfer occurs. Again, the burden of proof cannot be imposed on the insanity–acquitee. Presuma-

bly, an application for transfer will be initiated by the hospital; the doctors' assessment of the appropriate care required naturally will be given considerable weight. The court must also consider the public safety in approving a conditional release or transfer.

### H

### CONCLUSION

The insanity–acquitee is subject to the conflicting impulses of the State "to exculpate and to blame; to sanction and not to sanction; to degrade and to elevate; to stigmatize and not to stigmatize; to care and to reject; to treat and to mistreat; to protect and to destroy." Goldstein and Katz, *Abolish The "Insanity Defense"*– *Why Not?*, 72 Yale L.J. 853, 868–69 (1963). These conflicts are reflected in the State's relegation of the insanity–acquitee to the Pandemonium between the "mad" and the "bad"–shunned by the rigorous protections of the Mental Health Code, barred from the certainty of the criminal justice system. This Court concludes that the plaintiffs will prevail in their efforts to require the State to afford them due process and equal protection.

### IV

### IRREPARABLE INJURY

■ The loss of liberty without due process of law, and in violation of the equal protection clause is one of the most grievous injuries known to our constitutional system. Confinement to a mental hospital constitutes a deprivation of liberty and more: personal stigma, intrusions on personal security and compulsory psychiatric treatment. *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 480, 63 L.Ed.2d 552 (1980). The Court can conceive of few injuries more loathsome and irreparable than the unconstitutional commitment of individuals to a mental hospital.

### V

### HARM TO THE DEFENDANTS

■ The defendants have not indicated, nor can the Court conceive of any harm which may result to the defendants if preliminary injunctive relief is granted. In fashioning the appropriate relief, the Court will bear in mind the burden and cost that hearings entail for the State.

### VI

### PUBLIC INTEREST

■ Again, the defendants have not argued that granting the preliminary injunction will disserve the public interest. The public obviously has an interest in the continued confinement of persons who are mentally ill and who, through recent overt acts or expressed threats of violence, have evidenced a likelihood of inflicting injury on others. The injunction will not violate this interest.

### VII

### RELIEF

■ All persons currently confined to mental hospitals in the State of Georgia by virtue of Ga.Code § 27–1503 shall be given a hearing within 90 days to determine their present mental state. The State shall bear the burden of proving by clear and convincing evidence that the individual meets the criteria for involuntary hospitalization in Ga.Code Chapters 88–5 or 88–25. All persons found to meet the criteria shall be classified as either (1) insanity–acquitees who were charged with serious violent crimes; or (2) insanity–acquitees who were not charged with serious violent crimes and who will be treated in every respect as M.H.C. committees. All persons must belong to one of these categories.

In the future, following a verdict of not guilty by reason of insanity, the trial judge, upon a showing of good cause by the prosecutor, may commit an individual to a hospital for a maximum of thirty days. Thereafter, a hearing shall be held according to

Ga.Code §§ 88–501(u) and 88–506.2.[32] In addition to the findings which must be made pursuant to Ga.Code § 88–506.2, the Court shall also identify the individual as either (1) an insanity–acquitee who was charged with a serious violent crime or (2) an insanity–acquitee who was not charged with a serious violent crime and who shall be treated in all respects as an M.H.C. committee.

Thereafter, the procedures for release shall conform to the requirements of Sections III. E. and F., and the procedures for transfer to Section G.

IT IS SO ORDERED.

---

**32.** The hearing may held in the Court where the not guilty by reason of insanity verdict was rendered.